Dana Johnson
johnsondanam@gmail.com
Idaho Bar No. 8359
Law Office of Dana Johnson, PLLC
P.O. Box 9623
Moscow, ID 83843
(208) 310-7003 (phone) / (208) 310-7004 (fax)

William N. Lawton (*pro hac vice* application forthcoming)
nlawton@meyerglitz.com
Oregon Bar No. 143685
Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Ave. NW, Suite 210
Washington, DC 20016
(202) 588-5206 x 107 (phone) / (202) 588-5409 (fax)

William S. Eubanks II (*pro hac vice* application forthcoming)
beubanks@meyerglitz.com
D.C. Bar No. 987036
Meyer Glitzenstein & Eubanks LLP
245 Cajetan Street
Fort Collins, CO 80524
(970) 703-6060 (phone) / (202) 588-5409 (fax)

Counsel for the American Wild Horse Preservation Campaign,
The Cloud Foundation, Return to Freedom, and Virginia
Marie Hudson, Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AMERICAN WILD HORSE PRESERVATION CAMPAIGN<br>1025 Alameda # 633<br>Belmont, CA 94002 | Case No.: 1:16-cv-00001 |
| THE CLOUD FOUNDATION<br>107 South 7th Street<br>Colorado Springs, CO 90905 | COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |
| RETURN TO FREEDOM<br>P.O. Box 926<br>Lompoc, CA 93438 | |

VIRGINIA MARIE HUDSON
3506 Eastside Highway
Stevensville, MT 59870

                       Plaintiffs

              v.

SALLY JEWELL, Secretary
Department of the Interior
1849 C Street N.W.
Washington, DC 20240

NEIL KORNZE, Director
Bureau of Land Management
1849 C Street, N.W.
Washington, DC 20240

ELLIOT TRAHER, Field Manager
Jarbidge Field Office
Bureau of Land Management
2536 Kimberly Road
Twin Falls, ID 83301

MICHAEL C. COURTNEY, District Manager
Twin Falls District Office
Bureau of Land Management
2536 Kimberly Road
Twin Falls, ID 83301

                    Defendants

      1.      This case challenges a controversial and precedent-setting plan by the Interior Department's Bureau of Land Management ("BLM") to permanently sterilize an entire herd of wild horses in the Saylor Creek Herd Management Area ("HMA")—an action that will disrupt and destroy the natural, wild, and free-roaming behavior of these horses, as well as the social organization and long-term viability of the herd to which they belong. The BLM authorized

sterilizing this wild horse herd in its recently approved Jarbidge Resource Management Plan

("RMP"), which the agency issued under the Federal Land Policy and Management Act

("FLPMA"), 43 U.S.C. § 1712(a), in order to provide comprehensive guidance for the

management of public lands in South-Central Idaho. By authorizing the sterilization of the entire

Saylor Creek wild horse herd in the Jarbidge RMP, the BLM failed to fulfill its statutory

obligations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f,

as well as the Wild Free Roaming Horses and Burros Act ("Wild Horse Act" or "WHA"), 16

U.S.C. §§ 1331–1340.

2.       In particular, the BLM violated NEPA by failing to adequately analyze the

environmental consequences of sterilizing an entire herd of wild free-roaming horses insofar as

that drastic action will adversely affect individual wild horses and the herd as a whole, as well

by failing to consider reasonable alternatives such as less invasive means to manage wild horse

population growth. The BLM also violated both NEPA and the Wild Horse Act by ignoring

significant comments from nationally recognized experts that advised the agency of its plan's

pitfalls and the myriad ways that it contravenes current scientific knowledge about wild horse

physiology and herd dynamics. Finally, by adopting an action that fails to protect wild horses

and uses an unprecedentedly intensive and invasive management practice, the BLM violated the

Wild Horse Act itself. The BLM's failure to comply with the statutory mandates of NEPA and

the WHA render its decision in the Jarbidge RMP to sterilize the Saylor Creek wild horse herd a

violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, particularly due to

the BLM's failure to consider important aspects of the problem before the agency, its failure to

adequately explain the basis for its decisions, and its failure to respond to significant comments

concerning the adverse effects its plan will have on wild horses—actions that were committed in

3

a manner that is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, or without observance of procedure required by law. *Id.* § 706(2).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

4.      Pursuant to 28 U.S.C. § 1391, venue is proper in the Southern Division of the District of Idaho because the Saylor Creek HMA is located in Owyhee County, Idaho.

## PARTIES

5.      Plaintiff American Wild Horse Preservation Campaign ("AWHPC") is a broad-based coalition of public-interest groups, environmentalists, humane organizations, and historical societies representing over ten million supporters. Members of the organizations represented by AWHPC enjoy viewing wild horses on public lands, including the Saylor Creek Herd Management Area. AWHPC submitted comments on the BLM's Draft Environmental Impact Statement ("DEIS") and draft RMP, opposing the BLM's plan to sterilize the Saylor Creek wild horse herd and suggesting less invasive tools the BLM should use to manage wild horse populations. After the BLM issued the Final Environmental Impact Statement ("FEIS") and RMP, AWHPC timely filed a protest letter with the BLM, again objecting to the unlawful decision to sterilize the Saylor Creek herd and including extensive evidence, scientific literature, and expert opinions criticizing sterilization of wild horses.

6.      The BLM's objective of sterilizing the Saylor Creek wild horse herd harms AWHPC's organizational interest and the interests of its coalition members in protecting and preserving viable "free roaming" herds of "wild" horses on public lands, as well as their aesthetic interests in observing wild horses engaging in their natural behaviors on public lands.

7.       AWHPC has brought similar cases in recent years, challenging the BLM's prior efforts to control wild horse populations through sterilization. *Am. Wild Horse Preservation Campaign v. Salazar*, Civ. No. 11-1352 (D.D.C.) (ABJ) Dkt. Nos. 13–14 (Aug. 8, 2011); *Am. Wild Horse Preservation Campaign v. Salazar*, Civ. No. 11-2222 (D.D.C.) (BAH) Dkt. No. 26 (May 9, 2012). Although these prior cases led the BLM to withdraw previous similar wild horse sterilization plans, AWHPC has been forced to spend significant organizational resources monitoring, commenting on, opposing, and challenging in court—yet again—BLM's unlawful wild horse sterilization plan, when AWHPC's extremely limited resources could otherwise be spent on other programs and activities to promote its mission. AWHPC's mission is to increase protection for wild horses and burros in order to preserve these cherished animals and their natural behaviors for future generations to enjoy in the wild. For example, AWHPC works in Nevada through a cooperative agreement with the Nevada Department of Agriculture to humanely manage wild horses under state jurisdiction. To execute this management, AWHPC must expend significant funds to purchase hay, fencing supplies, and cattle guards to keep wild horses safe and away from roadways and housing developments. AWHPC must also spend resources to purchase hundreds of doses of the PZP fertility control vaccine, to humanely reduce population growth rates, and to train and certify community members to deliver the vaccine via remote darting. These efforts work directly to keep wild horses wild and free on the range, which is a key mission of AWHPC.

8.       A court order declaring unlawful the land use plan objective of sterilizing the Saylor Creek wild horse herd and requiring the agency to amend the Jarbidge RMP in compliance with NEPA and the WHA would protect AWHPC's interests and those of its coalition members in the welfare and continued viability of free-roaming herds of wild horses in

the Saylor Creek HMA and elsewhere in the U.S., and would allow AWHPC to devote its limited resources to other wild horse protection and preservation programs rather than having to spend such resources to counteract the BLM's unlawful action of sterilizing wild horses.

9.     Plaintiff The Cloud Foundation is a 501(c)(3) nonprofit organization headquartered in Colorado Springs, Colorado. The organization is dedicated to the preservation of wild horses and burros on public lands in the western United States, including the Saylor Creek HMA. The Cloud Foundation's supporters enjoy viewing, studying, photographing, and filming the natural behavior of wild horses in their natural habitats, free from human interference. The Foundation's supporters travel to various areas, including public lands in Idaho, specifically for the purpose of viewing wild horses.

10.     On behalf of its supporters, the Cloud Foundation also regularly submits comments on various BLM actions related to the management of wild horses and burros. The Cloud Foundation has written, and its executive director has spoken, about the difference in behaviors between geldings and stallions in an HMA in Oregon.  The Cloud Foundation's staff also has more than twenty years' experience documenting the behavior of wild horses in the United States and Canada. The Cloud Foundation has participated in lawsuits challenging the BLM's prior efforts to sterilize wild horses and signed AWHPC's protest letter regarding the Jarbidge RMP.

11.   A court order declaring unlawful the land use plan objective of sterilizing the Saylor Creek wild horse herd and requiring the agency to amend the Jarbidge RMP in compliance with NEPA and the WHA would protect the Cloud Foundation's interests in the welfare and continued viability of wild, free-roaming herds of wild horses and would allow the Foundation to devote its scarce resources to other conservation programs, such as its effort to work with the

6

BLM to manage wild horse populations using temporary, reversible contraceptives in Wyoming, Montana, and Colorado.

12.     Plaintiff Return to Freedom is a 501(c)(3) nonprofit organization headquartered in Lompoc, California. Return to Freedom is dedicated to preserving the freedom, diversity, and habitat of America's wild horses through sanctuary, education, and conservation. Return to Freedom has a nearly 20-year history of pioneering minimally invasive management of wild horses and burros at its sanctuary, which can be applied in the wild. Return to Freedom has relocated intact natural harem and bachelor bands, adopted "excess" wild horses from public lands, and provided those horses with sanctuary while managing populations using Native PZP (a temporary, reversible contraceptive) with an efficacy rate of 91 percent. Return to Freedom's mission for sanctuary focuses on the preservation and protection of the natural behaviors of wild horses and educating the public through sensitive observation of natural herd behaviors. Additionally, Return to Freedom advocates for minimally invasive management solutions to protect wild horses on public lands. Return to Freedom has devoted resources to opposing BLM's unlawful management of wild horse populations on public lands. For example, Return to Freedom's founder, Neda DeMayo, filed a declaration in AWHPC's litigation against BLM's prior effort to sterilize wild horses. *Am. Wild Horse Preservation Campaign v. Salazar*, Civ. No. 11-1352 (D.D.C.) (ABJ) Dkt. Nos. 13–14 (Aug. 8, 2011). AWHPC included that declaration as an exhibit with its protest letter regarding the BLM's plan at issue in this case. The BLM, however, did not address that declaration or the statements found therein.

13.   A court order declaring unlawful the BLM's objective of sterilizing the Saylor Creek wild horse herd and requiring the agency to amend the Jarbidge RMP in compliance with NEPA and the WHA would protect Return to Freedom's interests in the welfare and continued viability

of wild, free-roaming herds of wild horses and will allow Return to Freedom to devote its scarce resources to other wild horse conservation programs, including the preservation of rare and threatened heritage strains of the American Mustang, educational programs, on-the-range programs, and cooperative projects to increase on-the-range wild horse management solutions.

14.     Plaintiff Virginia Marie Hudson has a passion for observing wild horses exhibiting natural social behaviors in their natural habitats in HMAs on public lands, including the Saylor Creek HMA. She owns 21 equines, including one burro and two mustangs that were once under BLM management. Ms. Hudson regularly visits HMAs in order to observe and photograph the behavior of wild horses. Ms. Hudson recently visited the Saylor Creek HMA and has concrete plans to return both this autumn and again in future years. Ms. Hudson regularly visits the nearby Challis HMA, and based on recent visits to the Saylor Creek HMA, she intends to visit Saylor Creek in her regular trips to view wild horses in Idaho. Each year, Ms. Hudson spends roughly 18 days traveling to HMAs to observe wild horse behavior, even taking time off from work to do so. When observing wild horses, Ms. Hudson particularly enjoys observing the natural social behavior of stallions and of mares with foals, both of which are behaviors that would disappear (or at minimum be severely and negatively impacted) if the horses were sterilized. Ms. Hudson has observed distinctive wild horse behaviors during her visits to the Saylor Creek HMA. On other HMAs that Ms. Hudson has visited in Idaho, Nevada, and Oregon (and other wild horse habitat in Canada), smaller groups of wild horses maintained their distance from one another. In contrast, in the Saylor Creek HMA, Ms. Hudson has observed larger family bands gathering more closely. She has witnessed foals from different families laying down next to one another while their parents graze nearby. Ms. Hudson surmises that the horses display greater cooperation in this HMA for protection in very flat terrain. Ms. Hudson looks forward to

returning to the HMA in the spring to observe the distinctive behavior of the horses in this HMA. Because these distinctive behaviors involve the family dynamics of the wild horse herd, including their behavior with foals, Ms. Hudson worries that sterilization of this herd will dramatically change or destroy these distinctive behaviors, depriving her of the ability to witness behaviors that are unique in her experience of observing wild horses in different HMAs.

15.     Although Ms. Hudson would likely return to the Saylor Creek HMA even if the BLM carried through with its objective to sterilize the wild horse herd, she opposes the BLM's plan to do so because of the adverse impact sterilization would have on the horses' individual and herd behavior. This action will harm Ms. Hudson's aesthetic and recreational interests in observing and photographing the wild behavior of horses. Similarly, the BLM's procedural failures have injured Ms. Hudson: if the BLM had properly performed its analytical duties under NEPA and considered the statutory requirements of the WHA, the agency may have reached a decision that would better protect Ms. Hudson's interests in observing the natural behavior of wild horses on the Saylor Creek HMA.

16.     A court order declaring unlawful the BLM's objective of sterilizing wild horses and requiring the agency to revise the Jarbidge RMP in conformance with the WHA would protect Ms. Hudson's interests in the wild horses and her ability to enjoy the horses and their natural wild behaviors in the future.

17.     Defendant Sally Jewell is the Secretary of the Department of the Interior, the parent agency of the BLM, and is thus responsible for the decision challenged here.

18.     Defendant Neil Kornze is the Director of the BLM and therefore is also responsible for the decision at issue.

19.     Defendant Elliot Traher is the Field Manager of the BLM's Jarbidge Field Office. He signed the Record of Decision for the Jarbidge RMP and is thus responsible for its contents.

20.     Defendant Michael C. Courtney is the District Manager of the Twin Falls District of the BLM. He signed the Record of Decision for the Jarbidge RMP and is thus responsible for its contents.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

## I.     STATUTORY AND REGULATORY FRAMEWORK

### A.     The Wild Free-Roaming Horses and Burros Act

21.     Finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West," and that "they contribute to the diversity of life forms within the Nation and enrich the lives of the American people," Congress enacted the WHA in 1971 to ensure that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, [and] death," and that they are "considered in the area where presently found, as an integral part of the natural system of the public lands." 16 U.S.C. § 1331.

22.     The Act provides that the Secretary of the Interior "shall manage wild free-roaming horses and burros as components of the public lands … in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Id.* The WHA's implementing regulations require that "[w]ild horses and burros shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat." 43 C.F.R. § 4700.0-6(a). The regulations further require that "[m]anagement activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior." *Id.* at § 4700.0-6(c).

23.     The WHA provides that the BLM "may designate and maintain specific ranges on public lands as sanctuaries for [the] protection and preservation" of wild horses. 16 U.S.C. § 1333(a). As relevant here, the BLM's regulations recognize two types of management areas for wild horses: Herd Management Areas ("HMAs") and Herd Areas ("HAs"). An HMA is an area "established for the maintenance of wild horse and burro herds." 43 C.F.R. § 4710.3-1. In contrast, an HA is any "geographic area identified as having been used by a [wild horse or burro] herd as its habitat in 1971," when Congress enacted the WHA. *Id.* at § 4700.0-5(d). The important distinction is that wild horses *were* present on an HA in 1971, while a HMA *continues* to host wild horses.

24.     The BLM is tasked with protecting and managing wild horses and burros on nearly 26.9 million acres of the 245 million acres of public lands the agency administers. In delineating areas for wild horse use, the BLM "shall consider the appropriate management level for the herd, the habitat needs of the animals, [and] the relationships with other uses of the public and adjacent private lands." 43 C.F.R. § 4710.3-1. The appropriate management level ("AML") is "expressed as a population range within which [wild horses] can be managed for the long term" in a given herd management area without damaging the range. *See* BLM Handbook H-4700-1, at 4.2.1; 16 U.S.C. § 1331(b)(1) (authorizing the BLM to determine AMLs). In establishing, evaluating, or adjusting an AML for a management area, the BLM states that it will "include an in-depth evaluation of intensive monitoring data or land health assessment … includ[ing] studies of grazing utilization, range ecological condition and trend, actual use, and climate (weather) data [as well as] [p]opulation inventory, use patterns and animal distribution." BLM Handbook H-4700-1, at 4.2.2.1, 4.2.2.2. The National Academy of Sciences has noted that

the BLM's process for establishing and maintaining AMLs suffers from "major challenges," including a lack of transparency and questionable scientific methodologies.

25.     Although Congress amended the WHA in 1978 to provide the BLM additional flexibility in managing wild horse populations in balance with other uses of the range, the WHA as amended still constrains the BLM's wild horse management actions in certain crucial respects. For example, the WHA requires the BLM to keep a current inventory of wild horse populations in order to make determinations about "whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." 16 U.S.C. § 1333(b)(1). In making such determinations, the Act mandates that the BLM shall "protect" wild horses as an overarching statutory objective. *Id.* at §§ 1331, 1333(a). Further, the WHA states that "wild free-roaming horses … shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered … an integral part of the natural system of the public lands." *Id.* at § 1331. Moreover, the WHA states that land managers "shall consider the recommendations of qualified scientists in the field of biology and ecology." *Id.* at § 1333(a). Thus, the WHA imposes significant procedural and substantive constraints on the BLM's discretion to manage wild horse populations: the agency must consider recommendations from qualified scientists to determine how to protect wild horses from capture and harassment while managing them as an integral part of the natural system of the public lands.

26.     The 1978 amendments to the WHA demonstrated a strong congressional intent to confine and guide the BLM's discretion to manage wild horse populations to maintain the AML. Those amendments established a rigorous system that the BLM must follow before removing horses from the range. If the BLM, on the basis of the AML and other factors, determines that (a)

wild horses are overpopulating a given area of public lands, and (b) those horses must be removed, the agency may take measures to remove "excess" animals in order "to restore a thriving natural ecological balance to the range." 16 U.S.C. § 1333(b). The statute defines the term "excess" to mean those "wild free-roaming horses or burros … which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id.* at § 1332(f). As when it adjusts AML, in making an "excess" determination, the BLM "shall analyze grazing utilization and distribution, trend in range ecological condition, actual use, climate (weather) data, current population inventory … and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range in a" thriving natural ecological balance. BLM Handbook H-4700-1, at 4.3.

27.     As the WHA's implementing regulations make clear, the BLM "may close appropriate areas of the public lands to grazing use by all or a particular kind of livestock … [i]f necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment, or injury." 43 C.F.R. § 4710.5(a).

**B. The Taylor Grazing Act**

28.     Under the Taylor Grazing Act ("TGA"), 43 U.S.C. §§ 315–315r, the Secretary of the Interior, through the BLM, is "authorized" to issue permits for the grazing of livestock on public lands "upon the payment of reasonable fees." 43 U.S.C. § 315b. However, the statute further provides that "the creation of a grazing district or the issuance of a [grazing] permit … shall not create any right, title, interest, or estate in or to the lands." *Id.*

29.     Furthermore, the Secretary may withdraw land from grazing and reclassify it, devoting it to any "more valuable or suitable" use, including use by wild horses. *Id.* at § 315f; 43 U.S.C. § 1712.

**C. The Federal Land Policy and Management Act**

30.     The Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701–1787, is also administered by the BLM. FLPMA requires that certain public lands and their resources be "periodically and systematically inventoried and their present and future use [] projected through a land use planning process." *Id.* at § 1701(a)(2). FLPMA further mandates that "public lands shall be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." *Id.* at § 1701(a)(8). FLPMA thus requires the BLM to manage public lands for "multiple use," which Congress defined as "the management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people … with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." *Id.* at § 1702(c).

31.     FLPMA's implementing regulations require the BLM to periodically develop, maintain, and revise "resource management plans" ("RMPs"), which are written documents "designed to guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2.

**D. The National Environmental Policy Act**

32.     Congress enacted the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331–4370f, to ensure that federal agencies fully consider the environmental impacts of their actions before taking them, to ensure that agencies consider alternatives to proposed actions that may have less adverse environmental impacts, and to ensure that agencies make information publicly available with sufficient quantity and clarity to promote fully informed public participation in agency decision-making.

33.     To meet these objectives, all agencies must prepare an Environmental Impact Statement ("EIS") for any major federal action that may "significantly affect" the environment. *Id.* at § 4332(C). Approval of an RMP "is considered a major federal action significantly affecting the quality" of the environment, requiring the BLM to prepare an EIS. 43 C.F.R. § 1601.0-6. An EIS must include "a detailed statement" about a proposed action's environmental impact and a reasonable range of alternative actions and their environmental impacts. 42 U.S.C. § 4332(2)(C). An EIS "shall provide a full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts." 40 C.F.R. § 1502.1. This full and fair discussion must analyze cumulative impacts, which "result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions … [and which] can result from individually minor but collectively significant actions." *Id.* at § 1508.7. An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.* at § 1502.14. NEPA requires an agency to analyze environmental consequences of a proposed action as soon as it is reasonably possible to do so. 40 C.F.R. § 1501.2.

34.     Public engagement in agency decision-making is one of NEPA's principal goals. To that end, NEPA's implementing regulations require EISs to "be written in plain language … so that … the public can readily understand them." *Id.* at § 1502.8. Additionally, an agency preparing an EIS must "[r]equest comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected." *Id.* at § 1503.1(a)(4). The agency must also consider and respond to public comments. *Id.* at § 1503.4. In response to public comments, the agency may modify the project, amend the EIS, or if it disagrees with a comment, "[e]xplain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position." *Id.* at 1503.4(a).

35.     At the EIS process's conclusion, an agency must issue a record of decision ("ROD"). *Id.* at § 1505.2 The ROD must explain the agency's decision, identify all alternatives the agency considered, and explain the factors that led the agency to its ultimate decision. *Id.* An agency "shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and state how those considerations entered into its decision." *Id.* at § 1502.2(b). Finally, the agency must "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." *Id.* at § 1502.2(c).

## II.     FACTUAL BACKGROUND

### A.  The Saylor Creek Herd Management Area

36.     The Saylor Creek HMA includes roughly 95,000 acres of public lands under the BLM's jurisdiction. Despite the fact that the HMA is by definition "established for the maintenance of wild horse and burro herds," 43 C.F.R. § 4710.3-1, the BLM favors livestock grazing over wild horses in Saylor Creek (following the BLM's general pattern of favoring

livestock over wild horses throughout the public lands). For example, 126 miles of permanent fences divide the HMA's nearly 160 square miles into ten cattle pastures. In addition, the BLM has historically allocated roughly ten times as much forage for livestock as it has allocated for horses in this HMA, and the recently approved Jarbidge RMP will continue this highly inequitable pattern. As for water, the BLM has not provided wild horses in the HMA with access to the Snake River, where they historically watered, so the Saylor Creek herd relies on an artificial watering system designed and built for livestock.

37.     Wild horses have occupied the Saylor Creek area since before Congress passed the WHA, leading BLM to manage the area as an HMA. Human disturbance in the HMA has led the herd to favor certain home ranges, but the herd also ranges throughout the HMA to the extent that human disturbance permits. From 1987 to 2015, the BLM set the AML for the herd at 50 horses. In the recently approved Jarbidge RMP, the BLM modified the AML range wherein the BLM set the low AML at 50 wild horses and the high AML at 200 horses, meaning that the population is within the AML when there are between 50 and 200 horses. The herd's actual population has fluctuated in the past. The BLM reports that since 1982, it has conducted four roundups of horses from the HMA. In 1982 and 1989, the BLM removed horses from the HMA to reduce the population to the AML. The BLM does not report that it conducted any roundups in the sixteen years between 1989 and 2005. In 2005, large wildfires threatened the herd, leading the BLM to conduct an "emergency gather" in which it removed 334 horses and returned 93 horses to the HMA after the wildfires. Before releasing them, the BLM treated most mares with *Porcine Zona Pellucida* (PZP), a temporary, reversible contraceptive. In 2010, another set of wildfires again threatened the herd, leading to another "emergency gather," in which the agency removed 194 horses and subsequently returned 30 horses to the HMA. The BLM reports that

between 2006 and 2010, the herd had an average growth rate of 18%. This population growth

rate is not unusual for BLM-managed wild horse herds according to the National Academy of

Sciences, which "conclude[d] that it is likely that most free-ranging horse populations on public

rangelands in the western United States are growing at an annual rate of 15–20 percent."

38.     The BLM has not reported any deterioration of rangeland health in the Saylor

Creek HMA. Chapter 3 of the FEIS for the Jarbidge RMP describes the "affected environment"

and includes a section on "wild horses" that focuses on the Saylor Creek HMA. That section

describes impacts from several wildfires, but notes that "[o]ver the life of the 1987 RMP …

forage production has increased." While the horses do rely on a livestock watering system, "a

successful working relationship [with local ranchers] exists to ensure wild horses always have

sufficient water available." The "horses have developed a strong affinity to preferred areas, or

home ranges," but the BLM does not suggest that the horses have caused any localized

overgrazing in these preferred areas. Similarly, the BLM does not suggest that rangeland health

within the HMA is suffering, nor does it suggest that wild horses are responsible for any

measurable damage to the range.

**B.  The BLM's prior efforts to sterilize wild horses and Plaintiffs' prior opposition**

39.     Since 2010, the BLM has at least twice made and withdrawn site-specific plans to

sterilize wild horses. Although this case concerns the agency's first attempt to approve an RMP

authorizing the sterilization of an entire wild horse herd, the agency's prior similar efforts

illustrate that this RMP is part of a larger history of BLM's plans to sterilize wild horse herds as

an invasive means of population control.

40.     In June 2010, the BLM issued a draft of a general policy for the management of

wild horses and burros. Explaining that "Americans are passionate about wild horses and burros,

and there are many different, often conflicting, perspectives about how they should be managed," the BLM explained it was "committed to bridging these differences … to develop a strategy and find solutions that are best for wild horses, burros, wildlife, and the many uses of the public lands."

41.     In response, Plaintiffs AWHPC and the Cloud Foundation submitted comments stressing the importance of studying the deleterious impacts of livestock grazing on the public lands and considering a reduction in such use in order to both preserve the public lands and comply with the congressional mandates to protect the wild horses and burros that live there.

42.     On February 7, 2011, recognizing that "[t]he success of any strategy the BLM develops hinges on our ability to bridge the many divergent and conflicting perspectives about how the Wild Horse and Burro Program should be managed in the West," the BLM notified the public that it was commissioning a National Academy of Sciences ("NAS") committee to "gather data and provide reports" addressing the management of wild horse and burro populations, genetic diversity of the herds, the need to adjust AMLs, and various methods for managing wild horse and burro populations. In 2013, the NAS published its report, "Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward." The NAS report reviewed the science on wild horse fertility management and identified the most promising fertility control methods. At no point did the NAS review or recommend the wholesale sterilization of entire wild horse herds; instead, the NAS recommended several methods that would reduce and manage wild horse population growth rates while simultaneously preserving natural behaviors of wild horses and reproductively viable populations.

43.     However, the BLM did not wait for the NAS to issue its report before moving forward with plans to sterilize wild horses. Instead, three weeks after announcing that it had

19

commissioned the NAS report, on February 28, 2011, the BLM released a "Proposed Strategy" for long-term management of wild horses. For the first time in the 40-year history of the WHA, the BLM proposed "incorporating a non-reproducing component" of wild horses in a number of HMAs, "while maintaining the remainder of the herd as a self-sustaining (reproductive) population." In other words, the BLM proposed sterilizing both male and female horses and returning them to the range as a way to control their population and thereby purportedly protect the public lands from deterioration. The BLM noted that "it [is] unlikely that fertility control focused on males would be effective in slowing population growth." The BLM also noted likely behavioral changes, as "[g]eldings lose their stallion-like behavior after a few months, are less competitive than stallions, and have fewer impacts on herd social behavior as a result." In other words, the BLM acknowledged that it would sterilize both male and female horses and that this strategy would likely alter the natural behavior of wild horses. The BLM explained that it would wait for the NAS report before finalizing its strategy and would consider further public comments before adopting a final long-term wild horse management plan.

44.     Again, the BLM did not wait. Instead, three months later, in June 2011, the BLM announced that it would begin implementing its strategy of managing "non-reproducing" wild horses during a wild horse roundup in Wyoming. On July 25, 2011, Plaintiff AWHPC, along with other organizations and individuals, sued the BLM and sought a temporary restraining order and preliminary injunction to prevent the BLM from using this new, untested, and unprecedented management tool without considering its environmental impacts on individual horses, wild horse herds, or the range. *American Wild Horse Preservation Campaign v. Salazar*, Civ. No. 11-01352 (D.D.C.) (ABJ). In response to this lawsuit, the BLM withdrew its plan. The plaintiffs argued that the case was not moot because the BLM planned to use this new management approach in

other roundups. The Plaintiffs sought to amend their complaint to challenge this practice in order to establish that this management technique is inconsistent with the WHA and that the government would not use this management technique in the future. However, because the site-specific action at issue in that case had been withdrawn, the court dismissed that case as moot on August 8, 2011.

45.     Roughly two months later, on September 28, 2011, the BLM issued a preliminary Environmental Assessment ("EA") for a proposed roundup of wild horses from the "Pancake Complex," which included several HMAs in Nevada. (An EA is similar to an EIS, but less rigorous; generally, an EA's goal is to determine whether an agency action will have "significant" environmental impacts that require the preparation of an EIS. 40 C.F.R. § 1501.4). The BLM determined that the Complex contained 1,847 "excess" horses and proposed retaining 361 reproductively viable wild horses in the complex. The agency planned to implement this plan over two to four gathers within six to ten years. Under this plan, the BLM would round up roughly 1,000 wild horses every two to three years until it reached the target of 361 reproductive horses. The BLM also proposed to release 200 geldings to the range as a "non-breeding component" of the herd. The plan would also have used other fertility control methods, such as skewing the herd's sex ratio and administering short-term contraceptives.

46.     Plaintiff AWHPC commented on the BLM's Pancake Complex EA, opposing it on the grounds that the agency had not adequately analyzed important environmental impacts, including the effect of sterilization on individual horses and the entire wild horse herd. AWHPC further explained that the BLM could achieve its objectives through less drastic alternatives, such as reducing livestock grazing, and argued that the BLM should have prepared an EIS for this controversial, precedent-setting plan with uncertain environmental impacts. In support of its

comments, AWHPC submitted several sworn declarations from leading wild horse experts and others, which it had previously submitted in support of its motion for a preliminary injunction in the prior case challenging wild horse sterilization in Wyoming. Plaintiff The Cloud Foundation also objected to the BLM's failure to analyze the effects of sterilization on individual horses and wild horse herds, as well as the BLM's failure to prepare an EIS.

47.     On November 28, 2011, the BLM issued a final EA for the Pancake Complex that did not alter the draft EA, and issued a ROD that authorized the BLM to proceed with the gather and the sterilization of some male horses in the Pancake Complex. Plaintiffs AWHPC and The Cloud Foundation, along with other organizations and individuals, challenged the BLM's EA for the Pancake Complex. AWHPC filed the same expert declarations in that challenge as it filed in the prior case in Wyoming, but the BLM insisted these declarations were not part of the administrative record. The district court disagreed, concluding that the expert declarations were indeed part of the administrative record for the Pancake Complex decision record and EA and that the BLM should have considered those declarations in rendering a decision as to whether sterilization of wild horses was appropriate. *Am. Wild Horse Preservation Campaign v. Salazar*, 859 F. Supp. 2d 33, 45–47 (D.D.C. 2012).   Shortly thereafter, the BLM withdrew the Pancake Complex EA, mooting the case. Thus, the BLM has proposed and withdrawn two prior efforts at widespread sterilization of wild horses, although in those prior actions the BLM authorized only a *portion* of the herds at issue to be non-reproducing while co-existing with some reproductive stallions and mares, in contrast to the BLM's current plan to sterilize the entire herd in the Saylor Creek HMA.

### C. The Jarbidge Resource Management Plan

48.      The BLM's most recent authorization of widespread sterilization of wild horses appears in its Jarbidge RMP. In this RMP, the BLM has approved the sterilization of *all* wild horses in the Saylor Creek HMA, which stands in contrast to the prior wild horse sterilization plans described above in Wyoming and Nevada. In those actions, the BLM made formal findings that the wild horse populations at issue exceeded the relevant AMLs to the detriment of the rangeland, and thus the BLM determined that it needed to incorporate as *one* component of those actions *some* non-reproducing horses. In contrast, in the Jarbidge RMP the BLM authorized the extremely invasive action of removing and sterilizing *all* the wild horses in the Saylor Creek HMA without even documenting *any* damage to the range caused by the Saylor Creek herd and without finding that the herd contains large numbers of excess horses above the operative AML. Faced with a smaller problem, the BLM chose a much larger and disproportionate tool. The BLM authorized as its selected action the most invasive management practice available that will result in serious adverse consequences to individual horses and herd dynamics.

49.      The BLM published the Draft Jarbidge RMP and its associated Draft EIS ("DEIS") on September 3, 2010. These documents identified the BLM's "preferred alternative" of managing the Saylor Creek wild horse herd as a "non-reproducing" herd of between 50 and 200 horses. The DEIS stated that the BLM would round up all the horses in the HMA and return "*either spayed or gelded animals*." Thus, the DEIS identified not only the goal of sterilization but also the preferred means of gelding stallions and spaying mares.

50.      In response to the DEIS, Plaintiff AWHPC filed comments opposing the BLM's wild horse sterilization plan. AWHPC noted that the BLM had historically managed the HMA to favor livestock—which the BLM manages via grazing permits that it may revoke, suspend, or

modify in its discretion—to the detriment of the federally protected wild horses the agency has a

mandatory obligation to protect pursuant to the Wild Horse Act. AWHPC further challenged the

"limited and industry-centered range of alternatives" in the DEIS and suggested that BLM

should consider alternatives with greater protections for wild horses. AWHPC specifically

challenged the BLM's plan to sterilize the Saylor Creek herd, noting that "[a]ny plans for non-

reproducing herds, including gelded stallions and/or spayed mares should be excluded" from

further consideration by the agency. AWHPC specifically urged the BLM to prohibit "surgical

and/or chemical sterilization of horses." Instead, AWHPC urged the BLM to use proven

alternative population management strategies, including the use of short-term, reversible

contraceptives, which have strong support within the scientific community and are known not to

cause long-term effects to wild horse behaviors or physiology.

51.     On August 22, 2014, the BLM issued its Final EIS ("FEIS"). After providing the

necessary period for protest and for a review of consistency with state law, the BLM issued its

Record of Decision and Final RMP, along with the BLM Director's Protest Resolution Report,

on September 2, 2015. The Protest Resolution Report dismissed AWHPC's objections but failed

to address many of the specific comments raised in AWHPC's protest letter and exhibits.

### *1.* The BLM'S Record of Decision

52.     The BLM's Record of Decision for the Jarbidge RMP stated that the "BLM

selected to manage the Saylor Creek Wild Horse herd as a non-reproducing herd due to no

natural water on public land and no unique herd characteristics." The ROD stated that the BLM's

Wild Horses and Burros Management Handbook—an informal policy guidance that never

underwent notice and comment, that was published before the NAS provided scientific guidance

on managing wild horse populations, and that lacks the force of law—provided examples of

criteria that could be used to select HMAs for sterilization, including lack of water on public lands, reliance on private water, no special or unique herd characteristics, and low ecologic condition. These criteria do not appear in the WHA itself or in BLM's implementing regulations. The criteria appear only in the Handbook, which, again, has never been subject to notice and comment. The ROD then explained how the herd putatively met these criteria.

53.     First, the ROD stated that the herd lacks "special or unique characteristics" because it has a "genetic makeup [that] is average for feral wild horse herds with no trace back to Spanish decent [sic]." The term "special or unique characteristics" does not appear in the WHA, which Congress enacted to protect *all* wild horses rather than only those horses with a certain genetic makeup. Nor has the BLM ever defined this term in any regulation implementing the Wild Horse Act. Neither the ROD nor the Handbook on which it relied have offered any explanation of why a herd's genetic makeup is the only characteristic the agency reviews for being "special or unique." The Saylor Creek HMA is one of only six HMAs in Idaho and represents roughly 25% of the total area of all Idaho's HMAs. The Saylor Creek herd is the only population of wild horses within a roughly 50-mile radius, which seemingly qualifies as "special" under that term's plain meaning. In any event, the BLM has never drawn any rational connection between its finding that the Saylor Creek herd has an average genetic makeup and the agency's decision to sterilize all the herd's members.

54.     Second, the ROD noted that the HMA features "limited public land water" and that the herd relies on a livestock watering system, but neither the ROD nor the Handbook on which it relied made any express connection between the lack of naturally occurring water and the ostensible need to sterilize horses. Similarly, the ROD failed to acknowledge the FEIS's finding that "a successful working relationship [with local ranchers] exists to ensure wild horses

always have sufficient water available." The herd's reliance on a livestock watering system is not new, nor has the BLM offered any evidence to suggest that it has ever proven problematic. Additionally, the BLM's decision documents offer no indication of how sterilizing the herd could diminish any ostensible problem associated with access to water; after all, even sterilized horses will still need to drink. The BLM's decision documents thus wholly failed to explain why the lack of public water on the HMA led to the decision to set a goal of sterilizing this entire wild horse herd.

55.     Third, the ROD emphasized that sterilization would aid the BLM in maintaining a dispersed herd in the HMA. Seemingly, the ROD emphasized this argument because one of the Handbook's criteria for designating non-reproducing herds is "low ecologic [sic] condition," but the ROD never stated that the BLM made its decision on this basis. Indeed, the BLM has never offered any evidence that the HMA suffers from any low ecological conditions, nor that horses are responsible for them. Additionally, the ROD overstated its claim: the ROD stated that sterilization "would allow" the BLM to maintain a dispersed herd, but the portion of the FEIS that it cited in support stated with much less certainty that sterilization "may" cause erstwhile stallions to be less eager to breach fences. Moreover, as described below, the BLM never explained how this effect could possibly be consistent with the duty to maintain free-roaming behaviors, nor explained how the agency's current position could possibly be consistent with its finding in prior actions on other HMAs that geldings are more stationary and less prone to disperse. For these reasons, the BLM failed to draw any rational connection between the possibility that sterilization may promote dispersed herds and the decision to set a goal of sterilizing this entire herd.

56.     The ROD's stated "rationale for wild horse decisions" failed to draw any rational connection between its purported findings—that the HMA has limited water, that the herd has an average genetic makeup, and that sterilized males may breach fences less often—and the BLM's decision to sterilize this entire herd.

57.     The ROD also failed to address "essential considerations of national policy," as NEPA's implementing regulations require. 40 C.F.R. § 1502.2(b). The ROD did examine its consistency with efforts to preserve the sage grouse and did describe its consultations and coordination under other statutes, but it did not examine its consistency with the national policies that Congress enacted in the WHA itself. For example, the ROD did not address how its decision could possibly comport with the WHA's requirements that the agency "protect" wild horses. Indeed, the BLM did not mention this standard anywhere in the FEIS, RMP, or ROD.  Moreover, despite the fact that this authorization serves as the first-ever RMP to approve sterilization of wild horses, let alone the first BLM decision to authorize the complete eradication of reproductive viability in a wild horse herd, the BLM failed to consider and analyze the precedential consequences of this decision for future wild horse management in Idaho and other BLM jurisdictions.

58.     Further, the ROD did not "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. § 1502.2(c). As described below in greater detail, any method of sterilization will harm wild horses by subjecting them to traumatic roundups and surgical or chemical sterilization, and by disrupting many of their hallmark natural behaviors. Despite this fact, the ROD's single paragraph on mitigation measures did not even mention wild horses. The ROD did not explain what practicable means the BLM could take to avoid or minimize these

27

harms, despite the fact that the agency had ample scientific evidence from both the NAS report and the AWHPC's expert declarations suggesting that temporary, reversible contraceptives are a better and less invasive solution that would harm individual horses less and have less impact on their natural behaviors. The BLM ignored this scientific evidence, totally failing to explain in the ROD why the agency chose not to adopt this practicable means of avoiding environmental harm. Instead, the ROD simply confirmed that the BLM had chosen a clear goal of total sterilization of the entire Saylor Creek wild horse herd, which will lead to irreversible impacts to the horses and the herd as a whole.

### 2.  The FEIS and its failures

59.     The FEIS confirmed the objective of total sterilization of the Saylor Creek wild horse herd. Although the FEIS considered alternatives that included managing herds in which all horses would be reproductively viable, the BLM's preferred alternative continued to be a "non-reproducing herd." The FEIS confirmed that it planned to gather "*all* wild horses" and return only horses that meet the "population criteria" of being non-reproducing (i.e. sterile). Moreover, the FEIS confirmed that its population criteria include "[t]reating *all* wild horses surgically or chemically to *eliminate* reproduction capability." Finally, the FEIS confirmed that there would be "no foaling." In other words, the BLM left no doubt that its objective was to sterilize *all* the horses in the Saylor Creek HMA, totally eliminating their reproductive viability.

60.     Despite the clear objective of wholesale sterilization of this wild horse herd, the FEIS failed to analyze significant impacts that this objective will have on individual horses and the herd as a whole. First, the FEIS did not adequately consider how this action will affect the behavior of individual wild horses. The FEIS considered only one behavioral impact, stating that sterilization "may reduce the instinct of males to breech [sic] fences to intermingle and challenge

28

for control of neighboring bands," which the BLM reasoned may help reduce localized impacts from grazing by large bands of horses (although it has never suggested that localized overgrazing is problematic in this HMA). This scanty analysis considered only one of many known impacts of sterilizing stallions, such as the loss of competitive, aggressive, or defensive behavior, and failed to consider *any* known or obvious impacts of sterilizing mares. The NAS reported that sterilization can cause various physiological and behavioral impacts to mares, but the FEIS wholly ignored these impacts.

61.     The FEIS further failed to consider impacts from the complete and permanent elimination of pregnancy and foaling, despite the fact that these impacts flow from *any method* of permanently sterilizing horses. The permanent elimination of pregnancy and foaling for all mares in a population is itself a significant impact to horse behavior. It will alter the behavior of stallions and the entire herd. Stallion behaviors will change, including impacting natural behavior of guarding pregnant mares and mares with foals—a behavior that will obviously disappear if the herd does not include pregnant mares or foals. Eliminating pregnancy and foaling will also affect the entire herd by eliminating hallmarks of their wild behavior that revolve around reproduction, such as the sparring of stallions and the formation of harems. It will also affect members of the public who enjoy viewing wild horse behaviors, as described in a declaration included in AWHPC's protest letter that the BLM seemingly ignored. The FEIS did not address any of these impacts.

62.     Similarly, the FEIS failed to consider important physiological impacts on wild horses. Physiological impacts can include significant hormonal changes in both male and female horses, which can make horses weaker and slower and affect their ability to survive and compete in the wild. Although the NAS documented varying levels of risk from all known fertility

controls, and the AWHPC included declarations along with its protest letter documenting these and other physiological impacts on wild horses, the FEIS did not address these impacts in approving the sterilization of this wild horse herd.

63.     The FEIS also failed to consider impacts on the health of the range that may result from sterilizing the wild horse herd. By altering horse behavior, eliminating their reproductive capacity risks altering the way that the Saylor Creek herd impacts the HMA. As the BLM acknowledged in a prior EA, sterilized horses may gather in larger concentrations than fertile horses, risking greater localized impacts such as overgrazing. (The FEIS here stated that sterilizing males may aid in dispersing the horses, seemingly reversing the agency's perspective on this issue with no explanation.) At a minimum, the FEIS should have considered whether and how sterilizing the Saylor Creek herd would alter the impacts the herd has on its HMA. If the BLM changed its mind about the effects of sterilization, and now believes that it makes horses disperse rather than congregate in larger groups, the BLM should have explained the scientific basis for its reversal of position.

64.     Moreover, if the BLM believes that sterilization aids in maintaining dispersed herds by reducing the instinct of males to breach fences to vie for females, the agency should have analyzed and explained how this effect could possibly be consistent with the BLM's duty to manage wild horses to maintain free-roaming behaviors under 40 C.F.R. § 4700.0-6(c). The BLM defined the term "free-roaming" to mean that wild horses "are able to move without restriction by fences or other barriers within an HMA." Handbook H-4700-1, at 57. If sterilization makes fences more effective by reducing males' instincts to breach them, as the FEIS stated, then sterilization conflicts with the BLM's duty to manage horses to maintain "free-roaming" behavior. The FEIS should at a minimum have acknowledged and analyzed this issue.

65.     The FEIS also failed to consider a reasonable range of alternatives to its preferred tactic of wholesale sterilization of this herd. The FEIS considered only alternatives with "reproducing" or "non-reproducing" herds, but did not analyze an alternative with a partially reproducing herd. Prior plans from the BLM have aimed to control wild horse population growth through the use of temporary, reversible contraceptives. Similarly, the NAS study, which the BLM itself commissioned, offered scientific guidance on wild horse population management through the use of such fertility controls on *some, but not all*, horses within a herd. The WHA imposed on the BLM a statutory duty to consider this scientific input. Plaintiff AWHPC's comments on the BLM's DEIS also suggested that the agency should consider the use of temporary, reversible fertility controls on some horses, and NEPA imposed a statutory duty to consider this input as well. But despite the available science, its statutory duties, and its prior practice, the BLM here considered only the black-and-white alternatives of a herd that reproduces or a herd that does not. The FEIS should have considered alternatives that included the use of temporary, reversible fertility controls on some but not all members of the Saylor Creek herd in order to take a hard look at a full spectrum of alternatives.

66.     Similarly, the FEIS failed to consider an alternative that would have increased the herd's access to water. The agency's Record of Decision explained that it chose to sterilize the Saylor Creek herd in part because of a lack of naturally occurring water on the HMA, which currently forces the herd to rely on an artificial livestock watering system. Despite this, the FEIS did not consider an alternative that could have expanded the herd's access to water, either by reducing livestock grazing to expand the herd's access to the artificial watering system, or by providing a wildlife corridor that would allow the horses to reach, and water at, the Snake River (where they historically watered before human disturbance drove them away). Either of these

alternatives—reduced grazing or increased access to the Snake River—could have mitigated or eliminated one of the stated reasons for BLM's choice to sterilize this herd. The FEIS should have considered both, but failed to consider either.

67.      The FEIS also failed to consider relevant cumulative impacts on horses from the RMP's objectives. The FEIS did not consider any impacts to horses outside the Saylor Creek HMA. The FEIS stated that because this HMA is geographically isolated, wild horses do not migrate between it and other HMAs, which led the agency to conclude that "impacts related to wild horse management actions would only affect wild horses within the Saylor Creek HMA." However, the BLM also acknowledged that sterilizing this herd will require the BLM to regularly import horses from other HMAs, first by importing "excess" horses from other HMAs in Idaho, and then from other states. The BLM thus acknowledged that actions that impact the Saylor Creek herd will influence how many wild horses the BLM will import *and sterilize* from other HMAs, and how regularly it will have to do so. Importing and sterilizing horses from other HMAs may have a bevy of impacts both to the imported horses and the horses already residing in Saylor Creek. These impacts may range from physiological and behavioral changes to imported horses, associated with the trauma of roundups, transport, and sterilization, as well as the difficulty of integrating into a new herd. Similarly, the resident horses' may undergo behavioral changes associated with integrating new members into the herd or suffer from diseases that imported horses bring along. For all these reasons, the BLM should have analyzed how its objective of sterilizing this herd is likely to have cumulative impacts on other horses and other herds.

68.      With regard to the Saylor Creek herd itself, the FEIS also failed to adequately consider cumulative impacts. The FEIS analyzed cumulative impacts from only one source,

"land use authorizations." Within that category, the FEIS analyzed only impacts from energy projects. It did not consider cumulative impacts from four other sources—water use, vegetation management, fire management, and livestock grazing—despite the fact that the FEIS elsewhere acknowledged that each of these may impact the herd in significant ways. For example, the BLM's ROD grounded the decision to sterilize this herd in part on the HMA's lack of naturally occurring water, which forces the herd to share a livestock watering system, and the FEIS acknowledged that livestock watering may have cumulative impacts, but the FEIS did not address cumulative impacts from livestock watering on the Saylor Creek herd. Similarly, although the FEIS discussed direct and indirect impacts from vegetation management on wild horses, and acknowledged that vegetation management can have cumulative impacts, it failed to acknowledge or discuss cumulative impacts from vegetation management on wild horses. The FEIS also failed to discuss cumulative impacts from wildfires and fire management—despite the fact that it recognized that wildfires and management efforts can have cumulative impacts, documented impacts from fire on the Saylor Creek herd, and designated the HMA as a "critical suppression area … with the highest priority for fire suppression." Finally, the FEIS failed to discuss cumulative impacts from livestock grazing, despite the fact that the FEIS made clear that this herd competes with far greater numbers of livestock for forage and water. The FEIS should have considered how all these impacts and others act together in a cumulative fashion, but it failed to do so.

69.     The FEIS also included an internally contradictory discussion of the impacts of sterilization on the herd's genetic diversity, failing to either demonstrate informed decision-making or to provide the public clear, comprehensible information. The FEIS stated that managing a non-reproducing herd "would impact wild horse genetic diversity less than any other

alternative," including an alternative that would have managed a larger herd of reproductively viable horses. This statement defies logic and conflicts with science that was presented to the BLM in both the NAS study and numerous expert declarations furnished by AWHPC, yet the FEIS nowhere discusses this body of science that the agency had statutory duties to consider. This statement also conflicts with descriptions of genetic diversity, and management to maintain genetic diversity, elsewhere in the FEIS itself. The FEIS acknowledged that the "effective reproducing population [] influences the genetic diversity of a wild horse herd by affecting the size of the gene pool." Further, the FEIS acknowledged that reducing the number of breeding individuals risks the loss of genetic diversity, while increasing the number of breeding individuals mitigates that risk. Nevertheless, the FEIS concluded that totally eliminating the breeding population would impact genetic diversity less than alternatives that preserved or increased breeding populations. This internally contradictory discussion utterly fails to facilitate informed public participation in the agency's decision-making. (At one point, the FEIS even stated misleadingly that its preferred alternative would manage a breeding population, when in fact it would sterilize the whole herd.) This deficient analysis contravened the requirement that an EIS be written to provide clear information to members of the public, and failed to facilitate meaningful public participation or demonstrate informed agency decision-making.

70.     The FEIS also failed to demonstrate informed decision-making or to facilitate informed public participation because it ignored highly relevant scientific information that was known and available to the BLM. Most conspicuously, the FEIS never mentioned or cited the National Academy of Science report, "Using Science to Improve the BLM Wild Horse and Burro Program: A Way Forward." That report includes highly relevant material, such as an entire chapter on "methods and effects of fertility management" and another chapter on "genetic

diversity in free-ranging horse and burro populations." Yet, despite the fact that the WHA states that the BLM "shall consider the recommendations of qualified scientists" and the fact that *the BLM itself commissioned this report*, the FEIS never even mentioned it. A layperson reading the FEIS would have no way to know this report even exists, much less any assurance that the BLM actually considered the scientific evidence the agency itself commissioned. If the BLM had considered this report, it may have arrived at a very different decision from the current authorization of wholesale sterilization of a herd, because the NAS report identifies "the most promising fertility-control methods" as consisting of temporary contraceptives and the use of chemical vasectomies on *some, but not all* stallions in a herd. Similarly, the AWHPC's protest letter included declarations from leading experts in wild horse biology, which raised significant biological concerns with sterilization of wild horses and recommended the use of temporary, reversible contraceptives instead. The BLM did not meaningfully consider—let alone analyze— any of this highly probative scientific evidence. By ignoring the NAS report and the AWHPC's expert declarations, the FEIS failed to demonstrate informed agency decision-making or to facilitate informed public participation in the agency's decision.

71.     The FEIS and RMP also ignored important statutory mandates that Congress established in the WHA. Despite the fact that the Wild Horse Act aims to "protect" wild horses, none of the decision documents discussed this statutory requirement at all. The BLM's response to AWHPC's protest letter confirmed that the agency did not consider this statutory standard. AWHPC stated clearly in its protest letter that the BLM's authorization of complete and permanent sterilization of this herd would fail to protect the horses or to preserve their natural, free-roaming behavior and self-sustaining population. In response, the BLM utterly failed to explain how its authorization could possibly protect wild horses. This failure led to a deeply

flawed process that failed to even consider whether the BLM's goal was consistent with the WHA's statutory mandate.

72.     Possibly because the BLM's deeply flawed FEIS failed to even consider whether its goal was consistent with the WHA, the agency's final decision is in conflict with that statute. The WHA instructs the BLM to "protect" wild horses, but the BLM's objective of wholesale sterilization of an entire wild horse herd will entirely fail to honor this statutory requirement. Sterilization does not "protect" wild horses. Instead of protecting horses and preserving their wild, free-roaming behavior, sterilization will yield what one of AWHPC's expert declarants described as "a semi-free-roaming herd of domestic horses." Each individual horse will suffer trauma from being rounded up and chemically or surgically neutered, and the herd will lose many of its hallmark behaviors for which Congress protected wild horses in the first instance. Although the BLM has some discretion to take actions to manage wild horse populations to preserve other range resources and uses, the BLM has not documented any impairment of range resources or uses here requiring such an invasive wild horse management practice, in conflict with the WHA.

73.     In sum, the BLM's plan to permanently sterilize the entire herd of wild horses in the Saylor Creek HMA will fundamentally change the herd and all its members. Permanent sterilization will irrevocably destroy the horses' natural social behaviors, taking away the very behaviors that make these horses wild. At best, the herd will become "a semi-free-roaming herd of domestic horses." Moreover, the BLM's plan to regularly import and sterilize horses from other HMAs will convert the Saylor Creek HMA—which Congress designed to host a self-sustaining population of wild horses and which has served that purpose for over 30 years—into a glorified holding pen for sterile horses that will neither enjoy their natural behaviors nor have

any capacity to sustain the herd's long-term future. As alleged in detail below, the BLM's plan

violates the National Environmental Policy Act, the Wild Free-Roaming Horses and Burros Act,

and the Administrative Procedure Act.

## PLAINTIFFS' CLAIMS FOR RELIEF

### I.   Violations of the National Environmental Policy Act

74.   Plaintiffs incorporate paragraphs 1 through 73 by reference.

75.   By failing to consider the direct, indirect, and cumulative impacts from

sterilization on the behavior and physiology of wild horses and herd dynamics, as well as their

environment in the Saylor Creek HMA, the BLM violated NEPA and its implementing

regulations.

76.   The FEIS failed to consider reasonable alternatives, including alternatives that

would render only some horses non-reproducing; that would manage the herd's population

growth using temporary, reversible contraceptives with proven scientific efficacy; that would

increase the herd's access to water by reducing livestock grazing; and that would increase the

herd's access to water by providing access to the Snake River. By failing to analyze a reasonable

range of alternatives to its goal of sterilizing an entire wild horse herd, the BLM violated NEPA

and its implementing regulations.

77.   By failing to analyze cumulative impacts to horses outside the Saylor Creek

HMA, and by failing to consider cumulative impacts from various sources (including livestock)

within this HMA, the BLM violated NEPA and its implementing regulations.

78.   The FEIS's discussion of impacts to the genetic diversity of the Saylor Creek wild

horse herd is so unclear, unsubstantiated, and internally contradictory that it violated NEPA and

its implementing regulations by failing to analyze real data, failing to offer rational analysis,

failing to facilitate fully informed public participation, and failing to demonstrate informed agency decision-making.

79.     By failing to consider the NAS report on wild horse management and the AWHPC's expert scientific declarations, the BLM failed to demonstrate informed decision-making and failed to facilitate public participation in the agency's decision-making, in violation of NEPA and its implementing regulations.

80.     By failing to respond to specific comments that the AWHPC and other members of the public submitted in response to the DEIS, the BLM violated NEPA and its implementing regulations.

81.     By failing to explain to the public the basis for its decision to sterilize an entire wild horse herd and to ground that decision in the health of the range or the necessity to manage wild horse populations to preserve other uses, the BLM violated NEPA's public participation mandate.

82.     By failing to explain or analyze in the ROD or FEIS essential considerations of national policy in the Wild Horse Act or the precedential implications of the BLM's action, the BLM violated NEPA and its implementing regulations.

83.     By failing either to adopt measures to avoid harms to horses or to explain why it did not adopt those measures, the BLM violated NEPA and its implementing regulations.

84.     Through these NEPA violations, the BLM has acted arbitrarily and capriciously, abused its discretion, acted otherwise not in accordance with law, and acted "without observance of procedure required by law," rendering its action unlawful under NEPA and Section 706(2) of the Administrative Procedure Act.

## II.   Violations of the Wild Free-Roaming Horses and Burros Act and the Administrative Procedure Act

85.     Plaintiffs incorporate paragraphs 1 through 73 by reference.

86.     The BLM's violations of the WHA in the FEIS, ROD, and RMP constitute agency action "not in accordance with law," in violation of Section 706(2) of the Administrative Procedure Act.

87.     By failing to consider how sterilization conflicts with its duty to manage wild horses to preserve their free-roaming behavior, failing to consider sterilization's impacts on wild horses it has a duty to protect, and by authorizing the sterilization of an entire herd of wild horses, which will impair wild horses' behavior and harm individual horses and the herd as a whole, the BLM failed to consider an important aspect of the problem before it and failed to protect wild horses. The BLM thus violated the WHA and acted arbitrarily and capriciously under Section 706(2) of the Administrative Procedure Act.

88.     By failing to consider how sterilization conflicts with its duty to manage self-sustaining wild horse populations, and by authorizing the wholesale sterilization of an entire wild horse herd, which will harm individual horses and destroy many of the herd's characteristic behaviors, and which will eliminate the herd's ability to be self-sustaining, the BLM failed to consider an important aspect of the problem before it and failed to protect wild horses. The BLM thus violated the WHA and acted arbitrarily and capriciously under Section 706(2) of the Administrative Procedure Act.

**WHEREFORE**, plaintiffs respectfully request that the Court enter an Order:

1.      Declaring that defendants have violated the National Environmental Policy Act, the Wild Free-Roaming Horses and Burros Act, and the Administrative Procedure Act;

2.      Enjoining defendants from taking any action to implement the Jarbidge RMP's land use plan objective of sterilizing the Saylor Creek wild horse herd;

3.      Vacating the Jarbidge RMP, ROD, and FEIS and remanding those decisions to the agency for further consideration consistent with the Wild Free Roaming Horses and Burros Act and the National Environmental Policy Act;

4.      Awarding plaintiffs their reasonable attorneys' fees and costs in this action; and

5.      Granting plaintiffs any further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Dana Johnson
Dana Johnson
johnsondanam@gmail.com
Idaho Bar No. 8359
Law Office of Dana Johnson, PLLC
P.O. Box 9623
Moscow, ID 83843
(208) 310-7003 (phone) / (208) 310-7004 (fax)

/s/ William N. Lawton
William N. Lawton (pro hac vice pending)
nlawton@meyerglitz.com
Oregon Bar No. 143685
Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Ave. NW, Suite 210
Washington, DC 20016
(202) 588-5206 (phone) / (202) 588-5409 (fax)

/s/ William S. Eubanks II
William S. Eubanks II (pro hac vice pending)
beubanks@meyerglitz.com
D.C. Bar No. 987036
Meyer Glitzenstein & Eubanks LLP
245 Cajetan Street
Fort Collins, CO 80524
(970) 703-6060 (phone) / (202) 588-5409 (fax)

Counsel for Plaintiffs