UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AMERICAN WILD HORSE PRESERVATION CAMPAIGN, et al., | Case No. 1:16-cv-00001-EJL |
| Plaintiffs | **MEMORANDUM ORDER** |
| v. | |
| RYAN ZINKE, et al., | |
| Defendants. | |

**INTRODUCTION**

Pending before the Court in the above-entitled matter are the Cross-Motions for Summary Judgment filed by the parties in this case. The Motions are fully briefed and ripe for the Court's consideration. The Court finds that the facts and legal arguments are adequately presented in the briefs and record. In the interest of avoiding further delay, and because the decisional process would not be significantly aided by oral argument, the Motions are decided on the record without a hearing. For the reasons stated below, the Court grants in part the parties' Motions for Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs[1] have brought this action against the Defendants[2] challenging the Bureau of Land Management's (BLM) August 22, 2014 Final Environmental Impact Statement (FEIS) and September 2, 2015 Record of Decision (ROD) revising the Jarbidge Resource Management Plan (JRMP), consistent with the Federal Land Policy and Management Act (FLPMA). (Dkt. 1.) Specifically, Plaintiffs oppose the BLM's decision adopting Alternative VI which proposes that the Saylor Creek wild horse herd be managed as a non-reproducing herd.

Plaintiffs' claims are brought under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, alleging violations of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. § 1331-1340. (Dkt. 1.) On the first claim, Plaintiffs allege the BLM violated NEPA by failing to take a hard look at and consider the significant impacts of its decision, a relevant scientific report, and a viable alternative. (Dkt. 1 at ¶¶ 74-84.) Plaintiffs further allege the BLM failed to properly respond to public comments thereby failing to engage in informed decision making and provide for meaningful public input as required by NEPA. Plaintiffs' next claim alleges the BLM violated the WHA and the APA by failing to

---

[1] Plaintiffs are organizations, coalitions, and an individual who share a common interest in the management of wild horses and oppose the decision to manage the Saylor Creek wild horse herd as entirely non-reproducing. The named Plaintiffs are: American Wild Horse Preservation Campaign, The Cloud Foundation, Return to Freedom, and Virginia Marie Hudson.

[2] Defendants are Sally Jewell, Secretary of the Department of the Interior; Neil Kornze, Director of the BLM; Elliot Traher, Field Manager Jarbidge Field Office; and Michael C. Courtney, District Manager Twin Falls District Office.

consider how its decision conflicts with its duties under the WHA. (Dkt. 1 at ¶¶ 85-88.) Defendants counter that the BLM's decision was in accord and fully complied with the applicable standards and requirements of these statutes. (Dkt. 10, 26, 30.) The parties filed Cross-Motions for Summary Judgment. (Dkt. 20, 26.) The Court finds as follows.

## STATUTORY FRAMEWORK

### 1. National Environmental Policy Act

Under NEPA, federal agencies are required to "assess the environmental consequences of their actions before those actions are undertaken." *Klamath–Siskiyou Wildlands Ctr. v. United States Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004). NEPA serves two fundamental purposes: (1) to require agency consideration of detailed information concerning significant environmental impacts of a proposed action and (2) to inform the public that the agency has considered the environmental concerns in its decisionmaking process while ensuring that the public can both access and contribute to that body of information via comments. *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1034 (9th Cir. 2006) (citation omitted).

NEPA imposes procedural rather than substantive requirements to ensure the agency took a "hard look" at how its decision will affect the environment by considering the relevant evidence and information before it and then placing its decision, its explanation for reaching its decision, and the basis for its decision before the public. *Oregon Nat. Desert Assn. v. United States Bureau of Land Mgmt.*, 625 F.3d 1092, 1099-1100 (9th Cir. 2010); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). Taking a "hard look" requires the agency to consider "all foreseeable direct and indirect impacts" as well

3

as discuss "adverse impacts that do[] not improperly minimize negative side effects." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006) (internal quotation marks and citations omitted); *see also Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007) ("[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.") (internal quotation marks omitted). As such, NEPA "does not mandate particular results, but simply describes the necessary process" that an agency must follow in issuing an EIS. *Kettle Range Conservation Grp. v. United States Forest Serv.*, 148 F.Supp.2d 1107, 1116 (E.D. Wash. 2001) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)); *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062 1070–71 (9th Cir. 2002) (NEPA "'simply guarantees a particular procedure,'" rather than a substantive result.).

In reviewing an EIS, courts apply a rule of reason standard to "determine whether the EIS contains a reasonably through discussion of the significant aspects of the probable environmental consequences." *League of Wilderness Defenders-Blue Mnts. Biodiversity Proj. v. United States Forest Serv.*, 689 F.3d 1060, 1076 (9th Cir. 2012) (citation omitted). "This standard 'requires a pragmatic judgment whether the EIS's form, content[,] and preparation foster both informed decision-making and informed public participation.'" *Id.* (quoting *Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)). The Court's role under NEPA is not to determine whether the BLM's decision is correct but is, instead, to simply ensure that the agency undertook the requisite "hard look" at the relevant evidence in making its decision and disclosed the basis for its decision

and environmental impact of its actions to the public. *Assn. of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1183 (9th Cir. 1997); *Oregon Nat. Resources Council v. Lowe*, 109 F.3d 521, 527 (9th Cir. 1997)).

## 2.     Wild Free-Roaming Horses and Burros Act

Enacted in 1971, the Wild Free–Roaming Horses and Burros Act (WHA) mandates that wild horses, as "living symbols of the historic and pioneer spirit of the West," are "protected from capture, branding, harassment or death," and as such are considered an "integral part" of public lands in areas where they were presently found. 16 U.S.C. § 1331; *see also Kleppe v. New Mexico*, 426 U.S. 529, 535–36 (1976) (citing legislative history). The statute requires the Secretary of the Interior, through the BLM as its delegate, to "manage wild freeroaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." *Fund for Animals v. United States Bureau of Land Mgmt.*, 460 F.3d 13, 15 (D.C. Cir. 2006) (quoting 16 U.S.C. § 1333(a)). The BLM uses localized "herd management areas" (HMAs) established in accordance with broader land use plans, to manage wild horse herds. 16 U.S.C. § 1332(c); 43 C.F.R. § 4710.3–1; *see also* 16 U.S.C. § 1332(a) (the BLM maintains "specific ranges on public lands as sanctuaries for their protection and preservation").

BLM must maintain a current inventory of wild horses so that it can "make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; [and] determine appropriate management levels [(AML)] of wild free-roaming horses [ ] on these areas of public lands...." 16 U.S.C. § 1333(b)(1). The BLM determines an AML for each HMA, based upon the number of adult

wild horses or burros consistent with "achieving and maintaining a thriving ecological balance and multiple-use relationship in a particular herd area." *Fund for Animals*, 460 F.3d at 15. The BLM defines the AML as "the number of wild horses that can be sustained within a designated HMA which achieves and maintains a thriving natural ecological balance in keeping with the multiple-use management concept for the area." *In Def. of Animals v. United States Dept. of Interior*, 751 F.3d 1054, 1072 (9th Cir. 2014). The Ninth Circuit describes the AML as "a vehicle used [by the BLM] to move towards a thriving natural ecological balance by which the BLM is alerted to address population imbalance." *Id*.

When the BLM determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals," the WHA requires the BLM to "immediately remove excess animals from the range so as to achieve the [AML]." 16 U.S.C. § 1333(b)(2). The term "excess animals" is defined as "wild free-roaming horses or burros (1) which have been removed from an area by the Secretary pursuant to applicable law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." *Id*. § 1332(f). Before taking such action, the BLM prepares a detailed "gather" plan and prepares an appropriate NEPA document. *Fund for Animals*, 460 F.3d at 16. The BLM must "determine whether [AMLs] should be achieved by removal or destruction of excess animals, or other options (such as sterilization or natural controls on population levels)." 16 U.S.C. § 1333(b)(1).

In 1978 the WHA was amended to provide the BLM with greater authority and discretion to manage and remove excess horses from the rangeland so that BLM could

"maintain a current inventory of the animals." 16 U.S.C. § 1333(b); *American Horse Prot. Assn. v. Watt*, 694 F.2d 1310, 1316-18 (D.C. Cir. 1982). The WHA gives the Secretary of Interior, and thus the BLM, a high degree of discretionary authority in managing wild horses on public lands. *American Horse Protection Assn. v. Frizzell*, 403 F.Supp. 1206, 1217 (D. Nev. 1975). That discretion, however, has limits. For example, the BLM may not choose inhumane management options, and must "protect and manage wild free-roaming horses and burros as components of the public lands." 16 U.S.C. § 1333(a) and (b)(2)(A), (C).

### 3. Federal Land Policy and Management Act

FLPMA's purpose is to manage public lands for "multiple use, [ ] with an increased emphasis on the management of the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 478 (9th Cir. 2011) (citing 43 U.S.C. § 1701(a)(8)). FLPMA also provides that the "public lands be managed in a manner that...will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

### STANDARD OF REVIEW

Judicial review of administrative agency decisions is made under the APA. 5 U.S.C. § 702. Such review is based on the administrative record compiled by the agency – not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). APA claims may be resolved via summary judgment pursuant to the standard set forth in

Rule 56. *See Nw. Motorcycle Assn. v. United States Dept. Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The APA requires that the agency action be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *League of Wilderness Defs. Blue Mnts. Biodiversity Proj. v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)).

There are two standards governing review of agency actions under the APA. *See Price Rd. Neighborhood Assn., Inc. v. United States Dept. of Transp.*, 113 F.3d 1505, 1508 (9th Cir. 1997); *Alaska Wilderness Rec. & Tour. v. Morrison*, 67 F.3d 723 (9th Cir. 1995). Factual disputes implicating substantial agency expertise are reviewed under the arbitrary and capricious standard and legal issues are reviewed under the reasonableness standard. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002) (citations omitted). These standards reflect the axiomatic distinction between "the strong level of deference we accord an agency in deciding factual or technical matters [and] that to be accorded in disputes involving predominantly legal questions." *Price Rd.*, 113 F.3d at 1508. ). Both standards may be applied in the same case to different issues.

An agency's factual decision will be deemed arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Wildland CPR, Inc. v. United States Forest Serv.*, 872 F.Supp.2d 1064, 1074-75 (D. Mont. 2012) (quoting *Gardner v. United States Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). That is to say, when an agency reaches a decision based on its expert review of the facts, a reviewing court should determine only whether the decision was "arbitrary or capricious." *Price Rd.*, 113 F.3d at 1508.

The scope of review under the arbitrary and capricious standard is narrow and courts do not substitute their judgment for that of the agency. *MotorVehicle Mfrs. Assn. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Western Watersheds Proj. v. United States Bureau of Land Mgmt.*, 181 F.Supp.3d 673, 677 (D. Ariz. 2016) (citation omitted). The arbitrary and capricious standard is "highly deferential, presuming the agency action to be valid and [requires] affirming the agency action if a reasonable basis exists for its decision." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (quotations and citations omitted). When applying this standard, courts grant substantial deference to the decisions and actions of federal agency defendants in adopting and implementing certain agency activities. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009) (quoting *Nat. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004) ("Where scientific and technical expertise is necessarily involved in agency decision-making, ... a reviewing court must be highly deferential to the judgment of the agency.")). "Where the question presented for review is a factual dispute which implicates 'a high level of technical expertise' we defer to 'the informed discretion of the responsible federal agencies.'" *Bahr v. United States Environ. Prot. Agency*, 836

F.3d 1218, 1229 (9th Cir. 2016) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)). The APA's "highly deferential standard" of review "is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *League of Wilderness Defs.*, 615 F.3d at 1130.

An agency has wide discretion to determine the best scientific and commercial data available for its decision-making. *See Southwest Ctr. for Biological Diversity v. United States Bureau of Rec.*, 143 F.3d 515, 523 n. 5 (9th Cir. 1998). What constitutes the "best" available science implicates core agency judgment and a high level of technical expertise to which courts must defer so long as that determination was not arbitrary and capricious. *Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 377 (1989) (citations and quotations omitted); *Baltimore Gas & Elec. Co. v. Nat'l Res. Defense Council*, 462 U.S. 87, 103 (1983) (a court must be "at its most deferential" when an agency is "making predictions within its area of special expertise, at the frontiers of science"). In this regard, the Court does not substitute its judgment for that of the agency. *McNair*, 537 F.3d at 987.

The Court instead looks only to whether the agency's decision must be based on a consideration of the relevant factors, whether there has been a clear error in judgment, and whether the agency examined the relevant data and articulated a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *MotorVehicle*, 463 U.S. at 43 (citation omitted); *see also Marsh*, 490 U.S. at 378; *Center for Biological Diversity v. Nat. Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2013); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004). The court may not overturn an agency decision simply because it disagrees with the decision or with

the agency's conclusions about environmental impacts. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (The "court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action.") (citation omitted). Under the arbitrary and capricious standard of review, an agency's decision "need only be reasonable, not the best or most reasonable, decision." *Id.*

When a dispute is primarily legal in nature, or concerns a threshold question of law, this Court applies the more lenient, but less deferential, "reasonableness" standard. *San Luis Obispo Mothers for Peace*, 449 F.3d at 1028 (reviewing predominately legal issue for reasonableness because "it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominately legal questions"); *Ka Makani'O Kohala Ohana, Inc. v. Dept. of Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002) ("Because this case involved primarily legal issues...based on undisputed historical facts, we conclude that the 'reasonableness' standard should apply to this case.")). The "reasonableness" standard of review, applies only to those "rare" cases in which the agency's decision raises legal, not factual, questions. *Kettle Range*, 148 F.Supp.2d at 1116 (citation omitted). Under this standard, the Court will uphold the agency's decision unless it is unreasonable. *Friends of the Earth v. Hintz*, 800 F.3d 822, 836 (9th Cir. 1986).

## DISCUSSION

**1.     Jarbidge Resource Management Plan and the Saylor Creek Wild Horse Herd**

The JRMP guides land and resource management decisions for the public lands and resources managed by the BLM Twin Falls District, Jarbidge Field Office in south-central

Idaho and northern Nevada. (AR024676) (AR027311.) Within the planning area, the BLM owns and manages approximately 1,371,000 acres of public land surface and 1,463,000 acres of livestock grazing. The Saylor Creek Wild Horse Herd Management Area is a 102,000 acre area (95,000 acres of which are BLM-managed) located in the northern portion of the JRMP area. (AR025065.) The HMA was established pursuant to the WHA. It contains portions of eight livestock grazing allotments. (AR025252.) Wild horses have occupied the HMA throughout the past 50 plus years since the 1960's. (AR028990.) Over time, the wild horses in the HMA have lost access to natural water at the Snake River due to human presence associated with the development of private lands. (AR025253.) As a result, the herd is totally dependent on a developed pipeline water systems in the HMA. (AR028991.) Maintenance of the pipeline is shared by permittees and the BLM and is vital to the wild horses' survival.

In 2009, the Saylor Creek Herd had an estimated population of 168 with an average annual growth rate of 18% between 2006 and 2010. (AR025254.) In the summer of 2010, several wildland fires forced the emergency gather of the herd, then totaling 194 wild horses. In September of 2011, 30 wild horses were released back into the HMA. (AR025254.)

The original JRMP was prepared in 1987 and was amended in 1990, 1998, and 2005. (AR024678) (AR027311.) The BLM has determined the JRMP needs to be revised and updated in accordance with FLPMA in order to address new issues and changes in circumstances that have arisen since the original JRMP was prepared. As a result, the BLM

12

undertook the process of preparing the revised JRMP and, in doing so, issued the FEIS and ROD that are at issue in this case.

The FEIS considered seven management alternatives and ultimately selected Alternative VI as the preferred alternative. (AR024710) (AR027939.) The ROD is the final decision approving adoption of Alternative VI for the revised JRMP. (AR027939, 027941-42.) Alternative VI proposes the Saylor Creek Herd be managed as a non-reproducing herd with a management level range of 50 to 200 wild horses and an allocation of 2,400 animal unit months of forage to maintain the herd within the HMA. (AR025065-66.) Plaintiffs' Complaint in this case challenges that decision arguing the decision to "permanently sterilize" the entire Saylor Creek Herd violates NEPA and the WHA. (Dkt. 1.)

## 2. Ripeness

As a preliminary matter, Defendants argue the Plaintiffs' claims are premature because the JRMP is programmatic in that it only sets management goals and direction, it does not authorize any project or approve implementation of any specific future federal action. (Dkt. 26 at 14-15.) Instead, Defendants' argue, the Plaintiffs' arguments should be raised when the BLM develops a specific HMA plan for the Saylor Creek herd wherein it would decide which population management tools to use and considers the impacts of each along with any new scientific research. Plaintiffs maintain their claims are ripe as they have raised a procedural violation of NEPA contesting the BLM's reasoning and decision to manage the herd as non-reproducing, arguing the BLM violated NEPA's procedural requirements by failing to analyze the impacts of its decision to sterilize the herd regardless

of the methods it may later chose to use when implementing that decision. (Dkt. 27 at 2, 5.)

"Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *See National Park Hospitality Assn v. Dept. of Interior*, 538 U.S. 803, 808 (2003) (citation omitted). In resolving ripeness challenges, the Supreme Court considers "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Assn., Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Before the Supreme Court in *Ohio Forestry* was a NFMA challenge to the Forest Service's forest plan for the Wayne Nation Forest located in southern Ohio. *Id*. There the Supreme Court determined that although the forest plan set logging goals, selected areas of the forest suitable for timber production, and articulated likely methods of appropriate timber harvest, it did not itself authorize the cutting of any trees and the plaintiffs failed to argue the plan caused any injury. *Id*. at 729. As such, the Supreme Court determined the suit in that case was not yet ripe for court review.

In this case, Plaintiffs' claims allege the Defendants violated NEPA's procedural requirements in deciding to adopt Alternative VI for the revised JRMP. The Court finds the claims raised here are ripe as they challenge whether the BLM complied with NEPA's procedural demands. Specifically, Plaintiffs are contesting the Defendants' decision to manage the Saylor Creek herd as a fully non-reproducing herd. (AR027894.) Delaying

14

consideration of these claims would cause prejudice and hardship to Plaintiffs in their ability to ensure the BLM's decision to sterilize the entire Saylor Creek Herd was done in accordance with NEPA. If not allowed to bring their claims now, Plaintiffs will be foreclosed from contesting the decision that the herd be managed as entirely non-reproducing and left with only the ability to challenge the methods to be used to implement that decision, but not the decision itself.

Judicial review is proper at this stage in order to ensure compliance with NEPA's procedural requirements. Further factual development would not significantly advance the Court's consideration or ability to deal with the legal issues before it. Moreover, the procedural challenges raised in this case are distinct from the substantive statutory violations present in *Ohio Forestry. See Kern*, 284 F.3d at 1071. Here, Plaintiffs' claims go to whether the BLM's decision approving Alternative VI violated NEPA's procedural requirements and are ripe for consideration.

**3.     Count 1: Violations of NEPA**

**A.     Failure to Consider Relevant Scientific Information and Significant Impacts of the Decision**

Plaintiffs claim the Defendants violated NEPA by failing to consider the significant direct, indirect, and cumulative impacts that sterilizing the entire herd will have on the behavior and physiology of wild horses and herd dynamics, the Saylor Creek HMA environment, and members of the public who have a strong interest in recreational observation of the natural behaviors of wild horses. (Dkt. 1 at ¶ 75) (Dkt. 20 at 28-30.) In particular, Plaintiffs assert the Defendants violated NEPA by failing to consider a highly

relevant technical report (the NAS Report) commissioned by the BLM itself from the National Research Council, a subsidiary of the National Academy of Sciences. (Dkt. 20 at 10-13) (Dkt. 1 at ¶ 79.)

In response, Defendants argue they have satisfied NEPA and argue the NAS Report, as well as the Administrative Record on whole, does not contradict but instead actually supports the BLM's decision to manage the herd as non-reproducing instead of attempting to control population growth by other means. (Dkt. 26 at 25) (Dkt. 30 at 4-5.) Plaintiffs reply that the Defendants' *post hoc* argument made in their summary judgment briefing is untimely and without merit; maintaining the Defendants violated NEPA by failing, and in fact refusing, to consider the NAS report as well as failing to consider the significant impacts of the decision in the FEIS itself. (Dkt. 27 at 6-9.)

Issued in 2013, the NAS Report examines the many factors, options, opinions, and difficulties involved in managing free-ranging horses and burros on public lands and offers a direction for a more sustainable way of effectively managing wild horses to ensure a healthy and viable equid population while still preserving the rangeland and ecosystem. (AR075466.) The Report made several summary findings about the current management of wild horses including: the current wild horse management lacks rigorous population-monitoring procedures; the statistics on the national population size is not scientifically rigorous; horse populations are growing at 15-20 percent annually; current management facilitates high population growth; population control is not achieved through self-limiting or predation; the most promising fertility-control methods are contraceptive vaccines and chemical vasectomy; horses should be managed as a metapopulation to maintain genetic

16

diversity; WinEquus population modeling is not transparent and it is unclear if and how it is used for management decisions; improvements to population modeling are needed; the BLM Wild Horses Handbook lacks specificity for monitoring and assessment methods and fails to provide clear definitions; and the establishment, monitoring, and adjustments to AMLs is not transparent or scientific so as to support management decisions and infuse public confidence. (AR075476-075485.)

The NAS Report concludes that because there are likely more horses on public lands nationally than are reported and given the high population growth, "the effects of fertility intervention, although potentially substantial, may not completely alleviate the challenges BLM faces in the future in effectively managing the nations free-ranging equid populations, given legislative and budgetary constraints." (AR075485.) The solution going forward suggested in the Report is for the BLM to employ a combination of "tools" to more intensively manage wild horses in a sustainable way and avoid the inevitable unsustainable population expansion and financial impact that will result from the current management structure. (AR075485) (AR075738-075743.) The NAS Report also examines the various options for managing the wild horse population and discusses the pros and cons of the different contraception methods. Notably, the NAS Report recognizes the importance of preserving the horses' natural behaviors but states that "[n]o method [of fertility control has been developed] that does not affect physiology or behavior" of horses. (AR075480.)

Having reviewed the FEIS, the parties' arguments, and the Administrative Record, the Court finds the BLM violated NEPA's procedural requirement by failing to consider and analyze, in the FEIS itself, the significant impacts of the chosen action alternative on

the wild horse herd as discussed in the NAS Report. *See River Runners for Wilderness*, 574 F.3d at 746; *Kern*, 284 F.3d at 1066. The NAS Report is relevant to the BLM's decision to manage the Saylor Creek Wild Horse Herd as wholly non-reproducing. The report discusses the significant impacts and consequences of the contraceptive alternatives and other management strategies to the horses, all of which are directly related and relevant to the BLM's decision to manage the herd as either reproducing or non-reproducing. The BLM was aware of the NAS Report but did not discuss or consider it in the FEIS nor is there any explanation as to why the report and the significant impacts on the wild horses that were addressed in the report were not considered in the FEIS.[3] *Oregon Nat. Desert*, 625 F.3d at 1099-1100; *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (The FEIS must "contain[] a reasonably thorough discussion of the significant aspects of the probable environmental consequences."). The Government's response briefs do not point to any part of the FEIS or ROD showing the BLM considered the NAS Report. (Dkt. 26, 30.) Instead, Defendants contend the Administrative Record, including the NAS Report, supports the BLM's decision and the NAS Report's analysis of the various contraceptive options is a subject to be considered later when the site-specific management options are decided.[4]

---

[3] The NAS Report was completed in 2013 prior to the FEIS being issued. (AR075460.) Public comments also brought the NAS Report to the attention of the BLM. (AR027035, Appx. P.)

[4] Public comments made concerning the Draft EIS proposed that the EIS be subject to immediate amendment based on the findings of the NAS Report. (AR027035, Appx. P.) The BLM's response to those comment states:

> BLM's management of public land and its resources is subject to current laws and policy. If the [NAS Report] results in changes to current law or policy, or new science that required changes to existing management of the [HMA] and wild

While the NAS Report will also clearly be relevant in the future when the BLM considers which specific management options to employ for the Saylor Creek HMA, it is still relevant to the decision at this stage as to whether the herd should be managed entirely as a non-reproducing herd. Specifically, the impacts of managing an entirely non-reproducing herd on the behaviors and characteristics of the wild horses.

The BLM's decision is to manage the Saylor Creek herd as a "non-reproducing herd," i.e., the Saylor Creek HMA will be managed for "a non-reproducing population of wild horses." (AR025879) (AR027894.) The management actions for that decision include an initial gather of all wild horses in the HMA and then returning only those horses to the HMA that meet the "population criteria." The proposed "population criteria" for the Saylor Creek HMA includes, but is not limited to, wild horses that are: treated surgically or chemically to eliminate reproduction capability and at least five years of age and older. (AR027894.) After the initial gather, the HMA would be repopulated with wild horses meeting the "population criteria" from the original Saylor Creek herd or animals currently being held in holding facilities with the priority for selection of animals from surplus wild horses from Idaho HMAs. (AR025879) (AR027894.) Under those parameters, the BLM

horses, necessary changes to the Final EIS and Herd Management Area Plan would be made in order for the BLM to remain compliant.

(AR027035, Appx. P.) In response to Plaintiffs' protest letters to the FEIS asserting NEPA violations, the BLM Director responded that the JRMP's decision to manage the herd as non-reproducing is programmatic in nature and that the specific management tools and the effects of each will be analyzed when deciding which management options to employ in the Saylor Creek HMA in a site-specific NEPA document. (AR0286954-55.) In doing so, the BLM Director cited to and quoted from the NAS Report. However, there is no similar discussion in the FEIS.

intends to create a herd that is entirely non-reproducing, lacks any young horses or foals, and may be mixed with horses from other herds, HMAs, or holding pens. As discussed in the NAS Report, all of those factors will have significant impacts on the behavior and social structure of the wild horses which the BLM has not considered or addressed in the FEIS.

The NAS Report discusses the many effects that sterilization may have on wild horse behavior and physiology. (AR075567-69.) Horses, the report explains, are "highly social animals" with varying social structures impacted in part by the geography the herd occupies as well as the horses' mating and reproductive practices and the presence of offspring. (AR075567-68.) Harems or bands of horses consist of a dominant stallion with subordinate adult males and females and offspring. (AR075500, Box 1-4.) There can also be territorial herds where stallions protect a territory and mate with females in that area. Under either structure, preventing births and reproductive capacity of the horses alters wild horse behaviors and the social structure of the herd. (AR075567-70.) For instance, the lack of any foaling in the herd eliminates the mother-infant bond as well as the behavior of young male stallions joining bachelor bands and young mares integrating into existing harems. (AR075567-68.) The NAS Report concluded that "absence of young horses itself would alter the age structure of the population and could thereby affect harem dynamics." (AR075607.)

Despite those significant impacts, the BLM's decision establishes a herd without any young horses by not only sterilizing the entire herd but also replacing horses from the Saylor Creek herd with only non-reproducing wild horses that are at least five years of age or older and possibly from other HMAs or holding pens. (AR027894.) There is no

discussion in the FEIS, however, of the impacts on the herd's behaviors that may result from the decision to manage the herd as entirely non-reproducing thereby eliminating from the entire herd any breeding instincts, the existence of foals and young horses, and a natural age structure. Nor does the FEIS analyze how the introduction of horses from other HMAs, herds, or holding pens would impact the Saylor Creek herd's behaviors and structure. The BLM has not considered nor explained how the herd will maintain its wild horse instincts, behaviors, and social structure if it is entirely non-reproducing. Further, the BLM has not taken a hard look at how the introduction of horses from holding pens, where they may have become domesticated and reliant on humans, or from other herds that are unfamiliar with the area and terrain will impact the herd and its wild horse behaviors and survival instincts. In sum, the BLM has failed to consider, in the FEIS, any of these significant impacts on the Saylor Creek herd's behaviors or on the HMAs environment itself. The Court therefore finds the BLM violated NEPA by failing to take the requisite "hard look" at these aspects of the decision.

The Defendants cannot kick the can down the road and hold off considering the significant impacts of its decision to maintain the entire herd as a non-reproducing herd under the guise of distinguishing the JRMA as a programmatic level NEPA document from a site-specific document.[5] NEPA requires the BLM, at this stage, to take the requisite "hard

---

[5] The Court notes that the FEIS contains a "toolbox" and "population criteria" for managing a non-reproducing, free-roaming herd evidencing that at least some site-specific management decisions have been made at the FEIS stage with regard to the decision to maintain the herd as non-reproducing. (AR025066.) The NAS Report likewise uses the "toolbox" language in its recommendation of how the BLM could manage the Wild Horse and Burro Program successfully

look" at how the decision to manage the herd as non-reproducing affects the behavior and characteristics of the wild horses with sufficient detail to support its conclusions.[6] The FEIS and ROD in this case fail to do so.

If the BLM did in fact consider the NAS Report and/or the significant behavioral impacts to the herd and/or the impacts to the HMA when reaching its decision, it is not reflected in the FEIS. NEPA demands that the FEIS discuss the science upon which the agency's decision is based as well as disclose and respond to evidence weighing against its decision. *See Or. Nat. Desert Assn.*, 625 F.3d at 1099-1100; *Seattle Audubon Society v. Moseley*, 798 F.Supp. 1473, 1482 (W.D. Wash. 1992) ("NEPA requires that the agency candidly disclose in its EIS the risks of its proposed action, and that it respond to the adverse opinions held by respected scientists.").

It is not an adequate to merely include scientific information in the administrative record. NEPA requires that the FEIS itself "make explicit reference ... to the scientific and

_____

in the future making it possible that the BLM considered the NAS Report. (AR075738-39.) The shortcomings here are the FEIS's failure to show that some consideration was given to the NAS Report and to include an explanation of the reasoning underlying the decision to manage the herd as non-reproducing.

[6] As noted in the ripeness section of this Order, if there is no examination made at this stage to how managing the herd as non-reproducing will impact wild horse behavior, that relevant concern will never be addressed. NEPA demands a hard look be given to relevant concerns such as this and the Defendants have failed to do so here. The decision to manage the herd as entirely non-reproducing has been made without any discussion concerning the impact of that decision on the behaviors and characteristics of the wild horses. (AR025879) (AR027894) (The Approved JRMP contains objectives and management actions for maintaining the herd as non-reproducing.). Any later site-specific decisions selecting the particular management tools that will be used to maintain the herd as non-reproducing may factor in some of the impacts on the wild horses, but those decisions will not address the behavioral impacts of maintaining the entire herd as non-reproducing as that decision has already been made in the FEIS.

other sources relied upon for conclusions in the statement." *See* 40 C.F.R. § 1502.24; *see also Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (1st Cir. 1980) ("We find no indication in [NEPA] that…studies or memoranda contained in the administrative record, but not incorporated in any way into an EIS, can bring into compliance with NEPA an EIS that by itself is inadequate"); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (holding the deficiency in an Environmental Assessment to include references to material in support of or in opposition to of its conclusions is not cured by materials contained in administrative record.).

Accordingly, the Court concludes the Defendants have violated NEPA by failing to take a hard look at these important aspects of its decision and failing to disclose and analyze the NAS Report in the FEIS. *Or. Nat. Desert Assn.*, 625 F.3d at 1099. Therefore, the Court finds the BLM's decision is arbitrary and capricious in this regard. *Marsh*, 490 U.S. at 378; *MotorVehicle*, 463 U.S. at 43.

The Government's *post hoc* argument that the entire Administrative Record and, in particular, the NAS Report are consistent with and supports the BLM's decision does not cure the Defendants' NEPA violation.[7] (Dkt. 26 at 25-27) (Dkt. 30 at 4-5.) It may turn out

---

[7] The parties disagree over whether the NAS Report's conclusions are favorable or unfavorable to the decision to manage the herd as non-reproducing. The Government maintains the report supports its decision. (Dkt. 26 at 25.) Plaintiffs argue the report does not support sterilizing the entire herd. (Dkt. 27 at 5-9.) Regardless of whether the NAS Report supports or contradicts the BLM's decision, NEPA requires agencies to disclose both positive and negative anticipated impacts of a proposed action in the FEIS. *W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F.Supp.2d 1113, 1129 (D. Nev. 2008). In this case, the BLM failed to disclose the impacts of its decision to manage a herd as non-reproducing in the FEIS. Nor does the FEIS show that the BLM considered the relevant NAS Report in reaching that decision despite the fact that the BLM was clearly aware of the report. *See Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147,

that the NAS Report supports the BLM's decision and/or that the BLM considered the NAS Report when reaching its decision in the FEIS. The Court makes no determination in that regard nor is the Court deciding whether the BLM's decision is substantively correct or incorrect. *River Runners for Wilderness v. Martin*, 574 F.3d 723, 746 (9th Cir. 2009) (The court's review of an EIS under NEPA is "extremely limited" to make certain NEPA's process is followed, not to ensure any result.); *see also McNair*, 537 F.3d at 987.

The NEPA violation here is the Defendants' failure to show, in the FEIS, that the BLM considered the significant impacts of its decision on the behavior of the herd, considered the NAS Report, and the BLM's failure to explain the basis for its decision to manage the Saylor Creek HMA as an entirely non-reproducing herd in light of those significant impacts and the NAS Report's findings. *See* 42 U.S.C. § 4332(C) (NEPA requires the impacts of "major Federal actions significantly affecting the quality of the human environment" must be considered and disclosed in a detailed EIS.); *Oregon Nat. Desert Assn.*, 625 F.3d at 1099-1100. The NAS Report is relevant to the BLM's decision and the FEIS should have considered the report and/or provided an explanation as to why it was not considered. Likewise, the BLM's decision to manage the herd as entirely non-reproducing significantly impacts the herd's social structure, the wild horses' behavior, and the public's interest in preserving and observing those natural wild horse instincts and

---

1160 (9th Cir. 2006) (NEPA requires agencies to ensure professional and scientific integrity, by setting forth the methodologies used and making "explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement."), abrogated on other grounds by *Winter*, 555 U.S. 7 (2008) (citing 40 C.F.R. § 1502.24).

behaviors. The BLM failed to take a hard look at all of those significant impacts in the FEIS in violation of NEPA. The Government's after-the-fact explanation that the Administrative Record and NAS Report supports the BLM decision does not cure this NEPA violation. For these reasons, summary Judgment is granted in favor of Plaintiffs on this claim.

### B.    Informed Decision Making

Plaintiffs' claim the BLM violated NEPA's requirement for informed decision making, challenging the reasoning and rationales underlying the decision to manage the Saylor Creek herd as non-reproducing based on: 1) the herd's lack of a unique or desirable genetic descent, 2) the limited public land water in the HMA, and 3) that the BLM can more easily disperse a non-reproducing herd throughout the HMA. (Dkt. 20 at 13-17.) Plaintiffs disagree with the reasoning and studies relied upon by the BLM in the FEIS to support their decision and argue the decision is arbitrary and capricious. (Dkt. 20 at 13-17.) Defendants maintain the decision adopting Alternative VI for the JRMP satisfies NEPA because it is informed, based on the relevant evidence in the record, and reasonable. (Dkt. 26 at 12-13.) The Court finds the BLM has satisfied NEPA's demands as to its consideration of these three factors.

Generally, Defendants argue Alternative VI was selected because it addresses the needs and goals of the national wild horse program, the unique characteristics of the herd, and the resource characteristics of the HMA; it best resolves the issues and management concerns in consideration of all values and programs; and it relieves some of the national program's burden of managing thousands of unadopted horses while keeping the herd in

its natural habitat. (Dkt. 26 at 5, 11-12.) More specifically, Defendants point to six reasons for choosing to manage the herd as non-reproducing: 1) lack of Spanish genetic descent, 2) eliminates the need for gathers, 3) may reduce the instinct of males to breach fences, 4) able to disperse wild horse bands throughout the HMA, 5) maintaining a stable population easing the management needs for the watering system, and 6) increased ability to gather or move quickly in the event of wildfires. (Dkt. 26 at 12-13.) Plaintiffs counter that the Defendants' summary judgment briefing fails to address the reasoning stated in the FEIS and, instead, have pointed to other reasons to support the decision which were not previously set forth or analyze. (Dkt. 27 at 3.)

While the Court agrees with Plaintiffs to some extent in that the Defendants' summary judgment brief presents a better explanation of the BLM's reasoning than is presented in the FEIS, the Court finds the BLM's decision is not arbitrary or capricious with regard to its reliance on these factors - genetics, limited public land water, and dispersal of the herd. The FEIS discusses and refers to the evidence and studies the BLM relied upon in reaching its conclusions about the impacts of those factors when it made its decision. *See Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003) (Forest Service was not arbitrary and capricious when it referred to scientific literature and data it used to conclude that removing large trees would reduce fire risk).

While the Plaintiffs disagree with the outcome of the BLM's reasoning and decision, the BLM has reasonably explained the basis for its decision in the FEIS with regard to those factors sufficient to show that the BLM took a "hard look" at those factors and the evidence relating to those factors in reaching its decision. *Id.* The BLM's decision is

afforded deference. *Id.* ("[An] agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints."); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (stating that the court must defer to the findings made by the agency relying on reasonable opinions of the agency's experts even if, as an original matter, the court may find contrary views more persuasive). For these reasons, the Court denies the Plaintiffs' Motion for Summary Judgment and grants summary judgment in favor of the Defendants on this point.

That being said, the BLM's treatment of these factors does not address nor cure the BLM's failure to consider the significant impacts of its decision on the herd's wild horse behavior as discussed previously. The Court is remanding this matter to the BLM for it to satisfy NEPA's requirements in that regard. On remand, in order to satisfy NEPA, the WHA, and/or the APA, it may be necessary for the BLM to also reconsider its underlying reasoning and explanations relating to the above factors as they may be impacted when it addresses the remanded matters.

### C. Responding to Public Comments

Plaintiffs assert the BLM violated NEPA by failing to respond to comments concerning the decision to manage the heard as non-reproducing in two regards. First, comments expressing reasonable opposition to the decision. (Dkt. 20 at 18-20) (Dkt. 27 at 16-18.) Second, comments questioning the legality of the decision and whether that decision is consistent with the WHA, the implementing regulations, and the BLM's handbook. (Dkt. 20 at 21-26) (Dkt. 27 at 11-14.) Defendants maintain they appropriately

considered, disclosed, and responded to public comments in accordance with NEPA. (Dkt. 26 at 27-30.) Appendix P attached to the FEIS, Defendants argue, demonstrates that the BLM addressed the comments concerning their legal authority to maintain a non-reproducing herd, pointing commenters to the WHA and Wild Horse Handbook, and informed its decision-makers that maintaining a non-reproducing herd was potentially controversial to ensure the concern was considered.[8] Plaintiffs dispute that the Wild Horse Handbook supports the BLM's position. (Dkt. 27 at 15.)

NEPA requires the BLM to "respond to comments" on the draft EIS and "discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9; *see also* 40 C.F.R. § 1503.4.

The Court finds the BLM's responses to public comments in this case were insufficient to satisfy NEPA. Attached to the FEIS is Appendix P which is a table briefly stating the BLM's responses to comments from the Draft RMP/EIS. (AR026794.) Appendix P contains seventeen pages relating to public comments made concerning wild horses. (AR027031-48.) Public comments were made advocating preserving the wild herds in the West as "not non-reproducing herds" and questioning whether a non-reproducing herd is consistent with the WHA; including concerns over the significant impacts of the

---

[8] Defendants' response disputes that wild horses should be prioritized over livestock. (Dkt. 26 at 28-29.) The Court recognizes the BLM must balance the overall management concerns and multiple use demands on the lands and notes that arguments were raised during the NEPA process advocating for the prioritization of wild horses. In this case, however, the Plaintiffs have not raised claims or made arguments asserting wild horses should be prioritized over livestock. (Dkt. 27 at n. 10.) The Court, therefore, has not addressed that argument.

decision on wild horse behavior and the BLM's failure to consider a reasonable range of alternatives. (AR027047-48.) The BLM responded by pointing to its February 2011 national initiative for proposed strategy for management of wild horses and burros. The response went on to state that as to the Saylor Creek Herd Management Area, "a more detailed [HMA] plan will be developed following the [ROD]." (AR027048.) Other comments specifically challenged the BLM's legal authority to establish non-reproducing wild horse herds. (AR02740-41.)[9] In response, the BLM noted the alternatives that analyzed a non-breeding herd and pointed to the WHA and the BLM Handbook for its authority to establish a non-breeding wild horse herd. (AR027040-41.) Other responses by the BLM addressed the reasons underlying the need to control the population of wild horses, i.e., the availability of water in the Saylor Creek HMA and the AML. (AR027032-45.)

Given the nature of the issues raised in the public comments, the Court finds the BLM's responses to the public comments were insufficient. *See* 40 C.F.R. § 1503.4 (listing the means by which the agency may respond to public comments). In particular, the public comments raising questions as to whether the decision is consistent with the WHA, its regulations, and guidance manuals. Those comments highlighted clear discrepancies between the BLM's decision and the WHA, its regulations, and the BLM Handbook. Such

---

[9] Public comments were made questioning the BLM's legal authority to establish a non-reproducing herd. *See e.g.* (AR0169437-45.) The Defendants maintain that they have the authority to establish a non-reproducing herd. (Dkt. 26.) For the reasons stated throughout this Order, the Court has not ruled on that issue.

questions must be addressed in the FEIS by the BLM as NEPA requires that the agency ensure that its decision is consistent with the governing statutes and regulations. 40 C.F.R. § 1502.2(d) ("Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies."). The BLM has not done so here.

The Court recognizes that the BLM's interpretation of the regulations and its own Wild Horse Manual are afforded substantial deference. *See Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 613 (2013) (An agency's interpretation of its own regulation is afforded deference unless it is "plainly erroneous or inconsistent with the regulation."). The problem in this case is that the BLM has not given its interpretation. Merely referring to the applicable statutes and regulations does not address the substantive discrepancies raised in the public comments between those governing laws and the BLM's decision. *See Kraayenbrink*, 632 F.3d at 492-93 (NEPA requires that in the FEIS the agency to assess, consider, and provide a meaningful response to serious and considered comments.). Some discussion, beyond the BLM's current responses, addressing the concerns and issues raised in the public comments is required. Therefore, the Court finds that the BLM violated NEPA by failing to adequately respond to public comments. As such, the Court grants Plaintiffs' Motion for Summary Judgment on this issue and will remand the matter to the BLM for it to properly address the issues raised in the public comments as required by NEPA. In doing so, the Court has not decided whether or not the BLM has the authority to manage the herd as entirely non-reproducing nor whether that decision is consistent with the WHA. Instead, the Court remands the matter to the BLM to address, in the first instance, the procedural

30

NEPA violation which includes responding to the public comments drawing into question its authority to maintain an entirely non-reproducing herd.

### D. Consideration of a Reasonable Range of Alternatives

Plaintiffs argue the Defendants failed to consider a reasonable range of alternatives in violation of NEPA by failing to consider a partially reproducing herd alternative as opposed to only alternatives that were either entirely reproducing or entirely non-reproducing and by failing to give its reasons for not having considered a partially reproducing herd alternative. (Dkt. 20 at 26-28.) Defendants contend Plaintiffs have waived their right to advocate for a partially-reproducing herd alternative by failing to raise it during the NEPA process and, regardless, Defendants maintain they considered a reasonable range of alternatives meeting the purpose and need for the project. (Dkt. 26 at 20-21) (Dkt. 30 at 5-7.)

### i. The Partially Reproducing Herd Alternative Was Not Waived

Plaintiffs point out that during the public commenting process another group, the Animal Welfare Institute (AWI), questioned why the BLM did not consider a combination alternative of reproducing and non-reproducing horses for the Saylor Creek Herd. (Dkt. 27 at 19) (citing AR0169445.) Defendants maintain the AWI did not clearly and obviously suggest that they should consider a partially-reproducing herd alternative. (Dkt. 26 at 23-24) (Dkt. 30 at 6.)

AWI's January 31, 2011 comments to the draft JRMP and EIS clearly challenged the range of alternatives considered by the BLM and advocated for a combination alternative. (AR0169437-38, AR0169441-45.) In particular AWI's letter states:

> AWI would not object to an alternative that proposed a combination of reproducing and non-reproducing horses to occupy the Saylor Creek Herd Management Area both to maintain an self-sustaining herd that is subject to non-lethal population control (i.e., immonocontraceptives) while also using a portion of the AML to provide a home for already "fixed" animals from long-term holding facilities. How the AML could be split between reproducing (controlled) and "fixed" horses would depend on the total AML set through the process used by the BLM (but not used in the RMP/EIS) to calculate AML. Considering the BLM's legal requirement to consider a range of reasonable alternatives in the RMP/EIS, it is unclear why it did not consider such a combination alternative.

(AR0169445).

The Court finds the Plaintiffs have not waived their right to raise a challenge to the BLM's failure to consider a partially-reproducing herd alternative. *See Pacific Coast Federation of Fishermen's Assn. v. United States Dept. of the Interior*, 929 F.Supp.2d 1039, 1046 (E.D. Cal. 2013). The Administrative Record shows that AWI clearly raised the BLM's failure to consider a mixed or partially-reproducing herd alternative during the public comments for the JRMP such that Defendants were made aware of and on notice of the same. Therefore, Court examines below the Plaintiffs' claim of whether Defendants considered an appropriate range of alternatives.

## ii.    The Reasonable Range of Alternatives Requirement

NEPA requires agencies to include in an EIS, among other things, a detailed discussion of alternatives considered when deciding on a proposed action. 42 U.S.C. §§ 4332(C)(iii), (E); *HonoluluTraffic.com v. Federal Transit Admin.*, 742 F.3d 1222, 1231 (9th Cir. 2014). Analysis of a proposed action and its alternatives "is the heart of the environmental impact statement" and is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of,

a particular project. 40 C.F.R. § 1502.14. The reasonable range of alternatives is derived from the Purpose and Need section of the EIS. *City of Carmel–by–the–Sea v. United States Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997); 40 C.F.R. § 1502.13 (An EIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."). "Agencies enjoy considerable discretion in defining the purpose and need of a project, but they may not define the project's objectives in terms so unreasonably narrow, that only one alternative would accomplish the goals of the project." *HonoluluTraffic.com*, 742 F.3d at 1230 (internal quotation marks omitted). Those challenging the failure to consider an alternative have a duty to show that the alternative is viable. *City of Angoon v. Hodel*, 803 F.2d 1016, 1021–22 (9th Cir. 1986).

"Judicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *HonoluluTraffic.com*, 742 F.3d at 1231 (internal quotation marks omitted). "The 'rule of reason' guides both the choice of alternatives as well as the extent to which the [EIS] must discuss each alternative." *Carmel–by–the–Sea*, 123 F.3d at 1155 (citations omitted). "An agency is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives." *HonoluluTraffic.com*, 742 F.3d at 1231 (internal quotation marks omitted). ].".") Nor does an agency need to discuss alternatives similar to alternatives actually considered, or alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management

of the area." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (citation and quotation omitted) (citation omitted).

What NEPA requires is that the agencies "[r]igorously explore and objectively evaluate all reasonable alternatives" that relate to the purposes of the project and briefly discuss the reasons for eliminating any alternatives from detailed study in the EIS. *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013); *see also Carmel–by–the–Sea*, 123 F.3d at 1155 n. 10 (quoting 40 C.F.R. § 1502.14(a)). "The existence of a viable but unexamined alternative renders an [EIS] inadequate." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (internal quotation marks omitted). "[T]he crucial inquiry for the Court is whether [the] selection and discussion of alternatives fosters informed decision-making and informed public participation." *California v. Block*, 690 F.2d at 767 (citation and quotations omitted).

Chapter one of the FEIS in this case details the purposes of the JRMP as providing overall management and long-term direction for lands and resources administered by the Twin Falls District, Jarbidge Field Office that will, as relevant here: maintain consistency with the FLPMA; ensure public lands are managed according to the principles of multiple use and sustained yield; provide an overview of goals, objectives, and needs associated with public land management; resolve multiple-use conflicts or issues between resource values and uses; preserve important cultural, historical, and physical resources; provide opportunities for sustainable uses of public lands; and address other issues and

management concerns. (AR024676.)[10] The need for the JRMP revision is to address the changes in circumstances that have occurred since the 1987 JRMP including: changes in ecological, social, and economic conditions; changes in user demands and impacts that require new management direction; new laws, regulations, and policies that created additional public land management considerations; and the requirements stemming from a 2005 Stipulated Settlement Agreement. (AR024677.)

Defendants argue the alternatives considered were tailored to the purpose of the JRMP, satisfied the requirements of NEPA and FLPMA, and provided a range of reasonable management options. (Dkt. 26 at 20-22).[11] It was not necessary to consider the mixed alternative, Defendants assert, because it is not a viable alternative. (Dkt. 26 at 23-24) (Dkt. 30 at 7.) Regardless, Defendants argue the mixed alternative is consistent with the selected alternative "because the [J]RMP contemplates management of reproducing

---

[10] The Purpose of the JRMP "is to provide direction for managing public lands in the [BLM] Jarbidge Field Office for the next 15 to 20 years. The approved plan will provide the framework for making decisions about managing resources, resource uses, and special designations within the planning area." (AR024626.) The purpose and need for the JRMP "is to provide a comprehensive framework for the BLM's management of public lands within the planning area and its allocation of resources pursuant to the multiple-use and sustained yield mandate of FLPMA" and "to address a number of new issues that have arisen since the…1987 [JRMP]." (AR024626, AR024676-77) (The JRMP is intended to be an "overall management and long-term direction for lands and resources" in the project area consistent with FLPMA; the multiple use and sustained yield mandate; resolve multiple-use conflicts between resource values and resource uses; promote diversity of biological resources and species; preserve cultural, historical, and physical resources; provide sustainable uses of public lands; and address other management concerns.).

[11] Defendants argue that Plaintiffs' "wild-horse-priority or no-grazing alternative" was not considered in depth because that proposed alternative is contrary to the multiple use mandate and is factually infeasible. As noted previously, the Plaintiffs in this case have not argued for wild horse priority over grazing and, therefore, the Court has not addressed that argument.

wild horse populations in other [HMA] 'in conjunction with' the non-reproducing Saylor Creek herd." (Dkt. 26 at 23.) The Court disagrees with the Defendants.

The Defendants' failure to consider a mixed approach/combination alternative violates NEPA. The alternatives considered in the FEIS are a no-action alternative, three alternatives providing for a reproducing wild horse herd, and three alternatives providing for a non-reproducing wild horse herd.[12] The alternatives presented varying population numbers for the wild horse herd ranging from zero to 600 and corresponding variations in the AMLs. (AR024710-25066) (AR025114-15.) No alternative providing for a combination/mixed population of reproducing and non-reproducing wild horses for the Saylor Creek Herd was considered. The Court finds such an alternative is viable, reasonable, and consistent with the purpose of the JRMP and, therefore, should have been considered by the BLM. *Westlands Water Dist. v. United States Dept. of Inter.*, 376 F.3d 853, 868 (9th Cir. 2004) ("The existence of a viable but unexamined alternative renders an environmental impact statement inadequate.").

It is clear from the Administrative Record discussed previously in this Order that there are several methods of contraceptives and other management strategies available that make managing the herd as partially-reproducing a viable and reasonable option that meets the purpose and needs of the JRMP. Given the number of possibilities for population

---

[12] The Draft EIS presented six alternative that were considered and responded to during public commenting. The FEIS added Alternative VI (Proposed RMP) which was derived from elements of the other alternatives and addresses other concerns and management objectives. (AR024710.)

management of the wild horse herd, the BLM should have considered an alternative that provided for a combination/mixed population. Further, the BLM should have, but failed to, provided an explanation for why such an alternative was not considered and/or determined to not be viable in the FEIS itself.[13] *See* 40 C.F.R. § 1502.14(a) (NEPA requires agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" and explain why potential alternatives excluded from this detailed study were not part of the analysis.). The BLM violated NEPA by failing to consider such an alternative and/or failing to articulate an explanation for why it did not examine the mixed-population alternative in detail in the FEIS.

The Defendants' cannot cure that violation in their briefing on the Motions for Summary Judgment by now arguing that a partially-reproducing herd alternative need not have been considered because it was not a viable option. (Dkt. 26 at 24.) The BLM never advanced the positions articulated in their briefing in the FEIS itself. *See* 40 C.F.R. § 1502.1 (The FEIS must "provide full and fair discussion of significant environmental impacts.").

NEPA's procedure required the Defendants to address the partially-reproducing herd alternative or provide a reasonable explanation for why it was not considered in the FEIS. Such an alternative is reasonable and meets the purpose and needs of the JRMP and, as such, the FEIS should have considered the alternative or provided some explanation for

---

[13] The FEIS states the alternatives provide a reasonable range of management options for achieving the purpose and need for the JRMP, meeting the multiple-use mandate of FLPMA, and resolving the planning issues for the area. (AR024710.) This conclusory statement alone does not satisfy NEPA's requirement that the BLM consider a reasonable range of alternatives.

why it was not considered. Doing so in response to a motion for summary judgment fails to meet NEPA's procedural demands. *Oregon Nat. Desert Assn.*, 625 F.3d at 1120 ("courts may not accept...*post hoc* rationalizations for agency action.").

"While interpretations that are 'first articulated in a legal brief [are] not categorically unworthy of deference,' the BLM's argument is simply a '*post hoc* rationalization advanced...to defend past agency action against attack.'" *Id.* (quoting *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 780 (9th Cir. 2006) (citations and quotation marks omitted)); *see also Motor Vehicle Mfrs.*, 463 U.S. at 50. ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action.") "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 50 (citation omitted)). Deficiencies in the agency's reasoning may not rectified by providing reasoning which the agency itself has not articulated. *Motor Vehicle Mfrs.*, 463 U.S. at 43. Thus, the Court must remand the decision to the agency so that it may reconsider its own reasoning and decision. For these reasons, the Court grants Plaintiffs' Motion for Summary Judgment on this claim and will remand the matter to the BLM.

**4.    Count 2: Violations of the WHA**

Plaintiffs' second claim alleges the BLM violated the WHA and acted arbitrarily and capriciously under § 706(2) of the APA by:

> [F]ailing to consider how sterilization conflicts with its duty to manage wild horses to preserve their free-roaming behavior, failing to consider sterilization's impacts on wild horses it has a duty to protect, and by authorizing the sterilization of an entire herd of wild horses, which will impair wild horses' behavior and harm individual horses and the herd as a

whole, the BLM failed to consider an important aspect of the problem before it and failed to protect wild horses.

[F]ailing to consider how sterilization conflicts with its duty to manage self-sustaining wild horse populations, and by authorizing the wholesale sterilization of an entire wild horse herd, which will harm individual horses and destroy many of the herd's characteristic behaviors, and which will eliminate the herd's ability to be self-sustaining, the BLM failed to consider an important aspect of the problem before it and failed to protect wild horses.

(Dkt. 1 at ¶¶ 87, 88.) Plaintiffs' claim asserts the BLM's decision is inconsistent with the WHA and the implementing regulations and handbook, particularly with regard to the BLM's duty to maintain the herd's free-roaming behavior and maintain self-sustaining wild horse populations. (Dkt. 20 at 21-26) (Dkt. 27 at 9-16.) Defendants maintain the agency's decision is consistent with the WHA and its regulations and handbook. (Dkt. 26 at 17-20.)[14]

A.    **Maintaining the Wild Horse Herd's Free-Roaming Behavior**

Under the WHA, the BLM has a duty to protect and manage wild horses so as to preserve their "free-roaming behavior." 16 U.S.C. § 1331; (AR162785.) The federal regulations for the WHA states "[m]anagement activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior." 43 C.F.R. § 4700.0-6(c). The WHA defines "wild free-roaming horses and burros" to mean "all unbranded and unclaimed horses and burros on public lands of the United States." 16

---

[14] Defendants argue the Plaintiffs waived their WHA claim by failing to support the claim in their summary judgment briefing; contending Plaintiffs should be limited to arguing only that BLM violated NEPA by failing to consider whether the proposed action is consistent with the WHA. (Dkt. 26 at 16.) Plaintiffs maintain they have not waived the WHA claim because they challenged the Defendants' failure to consider whether their decision approving the JRMP was consistent with applicable law; i.e., the WHA as well as the BLM regulations and handbook. (Dkt. 27 at 9-11.) The Court finds Plaintiffs have not waived this claim. The allegations making up the claim are addressed in the Plaintiffs' summary judgment briefing. (Dkt. 20, 27.)

U.S.C. § 1332(b). The BLM Handbook defines "free-roaming" as being "able to move without restriction by fences or other barriers within a HMA." (AR162836.)

Plaintiffs argue the BLM's reasoning underlying its decision to manage the herd as non-reproducing is inconsistent with its duty to maintain the herd's free-roaming behavior. Specifically, Plaintiffs argue the BLM failed to consider how maintaining an entirely non-reproducing herd would impact the wild horses' free-roaming behavior and that the BLM's "dispersal rational" of preventing the bands from reforming into large herds impairs the herd's free-roaming behavior. (Dkt. 20 at 17.)

### i. Managing the Entire Herd as Non-Reproducing

The Defendants decision to manage the herd as entirely non-reproducing is arbitrary and capricious. The BLM failed to consider the impacts of maintaining the herd as non-reproducing and whether those impacts were consistent with the requirement that the herd maintain its free-roaming behavior. As discussed previously in this Order with regard to the NEPA claim, the NAS Report clearly discussed several significant effects on the herd's wild horse behavior if it is managed as a non-reproducing herd which appear to be inconsistent with the goal of maintaining the free-roaming behavior of the herd. The BLM did not discuss those impacts nor how its decision is consistent with the WHA in the FEIS, ROD, or provide any substantive response to public comments on the same. Accordingly, the Court finds the Defendants decision is arbitrary and capricious for having entirely failed to consider this important aspect of the decision. *See Gardner*, 638 F.3d at 1224. In so concluding, the Court recognizes the deference afforded to the BLM in this regard and has not substituted its judgment for that of the BLM. *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d

40

832, 869 (9th Cir. 2003). The BLM's decision in this case is arbitrary and capricious because it did not consider the significant impacts its decision may have on the free-roaming nature of the herd nor explain why its decision is appropriate despite those impacts. *Motor Vehicle*, 463 U.S. at 43. For these reasons, the Court will remand this matter to the BLM for it to properly address this issue. In doing so, the Court is not deciding whether the BLM has in fact violated the WHA by deciding to manage the herd as non-reproducing or, stated differently, whether the BLM has the authority to manage a wild horse herd as entirely non-reproducing. The Court is instead remanding the matter to the BLM for it to properly consider and explain its reasoning on that question in accord with the procedural requirements of NEPA, the WHA, and the APA.

### ii.  Dispersal of the Herd in the HMA

The Court finds the BLM's decision is not arbitrary or capricious as to its reasoning and explanation provided to support its decision with regard to dispersal of the herd in the HMA. The FEIS discusses the Saylor Creek herd's tendency to favor parts of the HMA and to avoid others usually based on where human activities occur. (AR25253-54.) The FEIS and ROD both conclude that:

> Maintaining a non-reproducing wild horse herd may reduce the instinct of males to breech fences to intermingle and challenge for control of neighboring bands. Maintaining dispersal of bands of wild horses throughout allotments in the HMA would help prevent the bands from reforming into large herds and would decrease localized effects of wild horse grazing relative to alternatives managing for reproducing wild horse herds.

(AR025879, 027959.)

41

Any management of the herd's dispersal within the HMA will impact the "free-roaming" behavior of the wild horses to some extent. The WHA does not require that there be no impact on wild horses. Instead, the BLM is given wide discretion to make management decisions regarding wild horses and the HMAs within the goals and limits of the WHA. *See American Horse Protection Assn.*, 403 F.Supp. at 1217; 16 U.S.C. § 1333(b). As recognized elsewhere in this Order, the BLM has the responsibility to manage the many competing resource demands on public lands. The BLM appropriately considered and explained its reasoning for its decision based on dispersal concerns in the FEIS. That reasoning is afforded deference. *See Indep. Acceptance Co.*, 204 F.3d at 1251. The Court finds the BLM's dispersal reasoning in the FEIS in this case is not arbitrary or capricious.

That being said, the Court does not find the BLM's reasoning on this point cures the deficiencies found elsewhere in this Order. The BLM's dispersal reasoning only considers the management benefits of a non-reproducing herd. As discussed previously, the BLM failed to consider other significant impacts of its decision to manage the herd as entirely non-reproducing. The Court is remanding the matter to the BLM to consider those significant impacts of its decision. The BLM's reasoning on this issue may be affected by the issues remanded necessitating the BLM to also reconsider herd dispersal on remand.

### B.  Maintaining Self-Sustaining Wild Horse Populations

The WHA and its regulations provide that "[w]ild horses ... shall be managed as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat ... [and] shall be considered comparably with other resource values

in the formulation of land use plans." 43 C.F.R. §§ 4700.0-6(a) and (b). The BLM Handbook defines self-sustaining as the "ability of reproducing herds of wild horses and burros to maintain themselves in a healthy condition and to produce healthy foals." (AR162838.)

The FEIS recognizes this requirement stating "[s]elf-sustaining refers to the process whereby established populations are able to persist and successfully produce viable offspring." (AR025254.) The FEIS then goes on to discuss that the size of a population necessary to be self-sustaining varies by herds based on the demographic and sociological features of a herd and adjoining herds and the use of herd management to aid in genetic diversity. (AR025254-55.)

The BLM, however, failed to discuss the obvious contradictions between its decision to maintain a non-reproducing herd and the self-sustaining requirement that includes the herd's ability to produce "viable offspring" or "healthy foals." Neither the ROD nor the FEIS addressed this apparent disparity. The issue was raised and challenged in public comments. As the Court has previously determined, the BLM's response to those comments was insufficient. For these reasons, the Court finds the Defendants' decision is arbitrary and capricious because the BLM failed to consider this important aspect of the decision. Again, the Court is not deciding whether the Defendants violated the WHA but, instead, will remand the issue to the BLM for it to address in the first instance.

**ORDER**

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1)    Both Motions for Motion for Summary Judgment (Dkt. 20, 26) are **GRANTED IN PART AND DENIED IN PART** as stated herein.

2)    The Final Environmental Impact Statement and Record of Decision are **REMANDED** to the Bureau of Land Management for revision or amendment, as necessary, consistent with this opinion.

3)    This case is **CLOSED** subject to being reopened, if necessary, following the Bureau of Land Management's completion of a revised or amended Final Environmental Impact Statement and Record of Decision.

DATED: September 29, 2017

Honorable Edward J. Lodge
United States District Court